UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FOUNDATION AGAINST INTOLERANCE & RACISM, INC. and BENJAMIN STEWART,<br><br>*Plaintiffs*,<br><br>vs.<br><br>THE CITY OF NEW YORK;  THE NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE; DAVE A. CHOKSHI, as Commissioner of the New York City Department of Health and Mental Hygiene; and MARY T. BASSETT, individually and in her official capacity as Commissioner of the New York State Department of Health,<br><br>*Defendants*. | Case No.: 22-CV-528 (KPF) (JW)<br><br><br>VERIFIED<br>FIRST AMENDED<br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

**"Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality."**

**-** *Hirabayashi v. U.S.,* 320 U.S. 81, 100 (1943)

Plaintiffs, by and through their undersigned attorneys, allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs, Foundation Against Intolerance & Racism, Inc. ("FAIR") and

Benjamin Stewart, by counsel, bring this action under the U.S. Constitution, the New York

State Constitution, and federal civil rights laws against Defendants Mary T. Bassett, the

Commissioner of the New York State Department of Health; the City of New York; the New

York City Department of Health and Mental Hygiene; and Dave A. Chokshi, the Commissioner

of the New York City Department of Health and Mental Hygiene, for violating Plaintiffs'

statutory and constitutional rights, and the rights of Plaintiff FAIR's members, through their

issuance and enforcement of statewide and municipal policies that illegally classify individuals

on the basis of race, skin color and ethnicity when it comes to the dispensation and

administration of lifesaving prophylactics, therapies and treatments for COVID-19.

2.      Clinical studies demonstrate that monoclonal antibody and oral antiviral

therapies – all of which are experimental treatments under emergency use authorization – are

extremely effective at treating patients with mild to moderate COVID-19 who, due to age and

underlying medical conditions, are at high risk for progression to severe disease.

3.      Plaintiff FAIR's members include patients of all races and ethnicities including

those who, like Plaintiff Stewart, identify or are classified as "non-Hispanic/Latino white."

Because of their skin color and ancestry, these members and Plaintiff Stewart are and will be

given lower priority in receiving these treatments and therapies than similarly situated patients

who identify or are classified as "non-white" or "Hispanic/Latino."

4.      Because these therapies and treatments are so effective, Defendants'

discriminatory policies substantially increase the risk of hospitalization and death for COVID-

19 patients classified as "non-Hispanic/Latino white."

5.      Further, while monoclonal antibody and oral antiviral therapies are effective in

the *short term* at treating patients with mild to moderate COVID-19 who are at high risk for

progression to severe disease, their *long term* effects are unknown.

6.      Pursuant to the subject state and municipal policies, young or otherwise healthy

persons who identify as or are classified as "non-white" and/or "Hispanic/Latino" have been

and are being prioritized for these experimental treatments while vaccinated "non-

Hispanic/Latino white" patients as old as 64 without other severe risk factors receive no such

prioritization.

VERIFIED FIRST AMENDED COMPLAINT - 2

7.	As a result, "non-white" and/or "Hispanic/Latino" patients are disproportionately being made to assume the risk of long term negative side effects from these therapies solely because of the color of their skin and their ethnic heritage.

8.	Defendants' illegal policies of race-based medical rationing also promotes a vile and evil canard, rooted in eugenics, that non-white races and ethnicities are more sickly, weak, and infectious simply because of their skin color and ancestry.  Defendants' policy likens darker complexion to a disease or other negative condition. A higher level of melanin, however, is not a comorbidity.

9.	Defendants' policies of pathologizing skin color and ancestry has injured and will continue to harm Plaintiff's members by intentionally and unconstitutionally discriminating against them on the basis of their race and ethnicity – classifications that the Supreme Court in *Shaw v. Reno*, 509 U.S. 630, 643 (1993), denounced as "odious to a free people whose institutions are founded upon the doctrine of equality."

10.	Since Plaintiff Stewart, Plaintiff FAIR, and Plaintiff FAIR's members have been, are being, or will imminently be, subject to irreparable injury by this unconstitutional and discriminatory municipal policy, and since there is a realistic danger that the aforesaid policy will significantly compromise recognized federal and state statutory and constitutional protections of parties not before the Court, Plaintiffs are entitled to nominal damages as well as declaratory and injunctive relief.

11.	Plaintiffs therefore bring this action for injunctive relief, declaratory judgment, nominal damages, and attorneys' fees pursuant to, *inter alia*, 42 U.S.C. §§ 1983, 1981, 1988, 2000d, and 18116 as well as the New York State Constitution.

## JURISDICTION

12.     This Court has jurisdiction over Plaintiffs' federal law claims under 28 U.S.C §§ 1331, 1343(a), (3), and (4).  This Court has supplemental jurisdiction over Plaintiffs' New York State Constitutional claim under 28 USC § 1367, because that claim arises from the same facts and circumstances.

## VENUE

13.     Venue is proper for the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and (c).

## JURY TRIAL DEMANDED

14.     Plaintiffs demand a trial by jury of all issues properly triable thereby.

## THE PARTIES

15.     Plaintiff Foundation Against Intolerance & Racism, Inc. ("FAIR"), is a not-for-profit corporate entity duly organized under the laws of the State of New York, with its principal place of business located at 485 Madison Avenue, 16th Floor, New York, New York 10022.

16.     FAIR is a nonpartisan membership-based organization dedicated to advancing civil rights and liberties for all Americans. FAIR's purpose and mission are to promote equal protection under the law and to advocate for individuals who suffer discrimination based on their skin color, ancestry, or other immutable characteristics.

17.     Among FAIR's members are New York City and New York State residents of a number of different races and ethnicities, including non-Hispanic/Latino white ("members classified as white").

18.     Plaintiff FAIR's members classified as white are at high risk for contracting COVID-19.

19.     Plaintiff FAIR's members classified as white will seek treatment with Anti-SARS-CoV-2 Monoclonal Antibodies ("mAbs") and oral antivirals ("OAVs") (collectively "COVID treatments") if and when they develop symptoms, test positive for SARS-CoV-2, and are within 5-10 days of symptom onset.

20.     Plaintiff FAIR's members classified as white are suffering injury in fact from Defendants' racially and ethnically discriminatory policies because they and other individuals classified as non-Hispanic/Latino white cannot and will not be able to obtain monoclonal antibodies and/or oral antiviral treatments in the City or State of New York when they contract COVID-19 unless they demonstrate a medical condition or other factors that increase their risk for severe illness from the virus, while residents of New York City and New York State classified as non-white or Hispanic/Latino are not required to make such a showing.

21.     And, as more fully set forth below, even if they make such a showing, Plaintiff FAIR's members classified as white will be given the lowest possible priority because of their skin color and ethnicity.

22.     Plaintiff FAIR's members classified as white are also suffering injury-in-fact from Defendants' racially and ethnically discriminatory state and municipal policies because said policies subject them to an increased risk of serious illness or death when they acquire COVID-19.

23.     Defendants' unlawful state and municipal policies further injure Plaintiff FAIR's members classified as white because it causes them apprehension due to their increased risk of physical, psychological, and financial harm from COVID-19.

24.     Further, Plaintiff FAIR's members who are classified as non-white or Hispanic/Latino also are suffering injury-in-fact from Defendants' racially and ethnically discriminatory state and municipal policies because such members ("members classified as non-white") have been and are being prescribed and administered these experimental medicines pursuant to those policies despite the fact that, but for their ethnicity and skin color, such treatments often are not medically indicated.

25.     Solely because of their skin color or ancestry, Plaintiff FAIR's members classified as non-white have been and are being made to serve as test subjects and to assume a disproportionate share of the risk of long term negative side effects from these experimental therapies.  This has caused and will continue to cause those members apprehension of long term harm.

26.     Separate from the harm to its members, Plaintiff FAIR itself has suffered injury-in-fact from the discriminatory state and municipal policies challenged herein.  Upon learning about the subject state and municipal policies, Plaintiff FAIR has expended, and is continuing to expend, significant organizational time, money and resources, unrelated to this litigation, to address, protest, and challenge these policies to prevent future injury to Plaintiff FAIR's members.  These expenditures include, without limitation:

     a.   Researching the subject policies and educating FAIR staffers about them;

     b.   Outreach on several occasions to FAIR members within the City and State of New York to inform and educate them about the policies, share analyses regarding their lawfulness, and offering organizational support in responding to them;

     c.   Purchasing equipment to assist in FAIR's public protest of the policies;

    d.   Organizing and engaging in public protests and grassroots advocacy against the policies;

    e.   Creating and maintaining a webpage objecting to the discriminatory policies and urging the public to demand that New York State and New York City reverse them;

    f.   Lobbying the New York City DOHMH and the New York State DOH to withdraw the subject policies;

    g.   Organizing public events to combat the policies; and

    h.   Speaking to the press in opposition to the policies.

    i.   Advertising to inform and educate the public about the discriminatory policies and urging them to contact the New York City DOHMH and the New York State DOH to reverse them.

27.      And, of course, Plaintiff FAIR has expended substantial time, resources, and money to challenge these policies in court.

28.    Plaintiff FAIR has therefore suffered an "opportunity cost" by expending resources toward these ends that could have been allocated elsewhere.

29.    Plaintiff Benjamin Stewart ("Stewart") is a resident of Queens, in the City and State of New York.  He is white and not Hispanic, 34 years old, and vaccinated against COVID-19.  He receives all of his medical care within the City of New York.

30.    Plaintiff Stewart has no known risk factors for severe illness that could result from COVID-19.  He therefore does not qualify for inclusion in any Tier 1 "risk group" established by the New York State Department of Health or the New York City Department of Health and Mental Hygiene for prioritization of certain COVID-19 treatments.  If he were any

racial classification but white, or if he were white and Hispanic, he would qualify for Tier 1 Risk Group 1E.

31.     Plaintiff Stewart has not yet been infected with COVID-19, and he wants the ability to access oral antiviral or monoclonal antibody treatments on an equal basis, without regard to race or ethnicity, if and when he contracts the virus.

32.     Given the high transmissibility and infection rate of COVID-19, Plaintiff Stewart faces an imminent and substantial likelihood that he will be denied access to life-saving medicine as a result of Defendants' racial and ethnic preference system.  Plaintiff Stewart suffers fear and apprehension of future harm as a result of these discriminatory state and municipal policies.

33.     Plaintiff Stewart and Plaintiff FAIR's members classified as white are suffering injury-in-fact from New York State and New York City's discriminatory policies because they and other individuals classified as non-Hispanic/Latino white cannot obtain oral antiviral treatments in New York when they contract COVID-19 unless they demonstrate a "medical condition or other factors that increase their risk for severe illness" from the virus, while New York residents classified as non-white or Hispanic/Latino are not required to make such a showing. This discriminatory treatment inflicts injury-in-fact, regardless of whether Plaintiff Stewart and Plaintiff FAIR's members classified as white would ultimately obtain the antiviral treatments in the absence of the racially and ethnically discriminatory state and municipal policies.  *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member

of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing").

34.    That at all times relevant herein, defendant Mary T. Bassett was and is the Commissioner of the New York State Department of Health ("DOH").

35.    In such capacity, defendant Bassett is responsible for setting, promulgating and enforcing all directives, orders, and policies of the DOH.

36.    That at all times herein mentioned, defendant Bassett was acting within the course and scope of her employment with the DOH.

37.    That at all times herein mentioned, defendant Bassett was acting under color of state law.

38.    Defendant Bassett is sued herein in her official capacity pursuant to *Ex parte Young*, 209 U.S. 123 (1908).

39.    Defendant Bassett is also sued herein in her individual capacity insofar as Plaintiffs seek nominal damages.

40.    That at all times relevant herein, defendant City of New York ("defendant City") was and still is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

41.    That at all times herein mentioned, defendant City operated, controlled and maintained an agency, subdivision and department known as the City Department of Health and Mental Hygiene ("DOHMH").

42.    That at all times relevant herein, defendant Dave A. Chokshi was and is the commissioner of the DOHMH, and as such was and is employed by defendant City.

43.     In such capacity, defendant Chokshi is responsible for setting, promulgating, and enforcing all directives, orders and policies of the DOHMH.

44.     That at all times herein mentioned, defendant Chokshi was acting within the course and scope of his employment with defendant City.

45.     That at all times herein mentioned, defendant Chokshi was acting under color of state law.

46.     Defendant Chokshi is sued in his official capacity.

# FACTUAL BACKGROUND

## Efficacy of OAVs and Monoclonal Antibody Treatments

47.     The FDA recently approved oral antiviral therapies to treat patients with mild-to-moderate COVID-19 who are at high risk for progression to severe disease, regardless of vaccination status.

48.     Among these are monoclonal antibody products and oral antivirals that are extremely effective at preventing and treating COVID-19.

49.     The oral antiviral Paxlovid demonstrated an 88% reduction in hospitalizations and death in patients at high risk for severe COVID-19 disease.

50.     The oral antiviral Molnupiravir demonstrated a 30% reduction in hospitalizations and death in patients at high risk for severe COVID-19 disease.

51.     Both of these oral antivirals must be administered very quickly, within five days of symptom onset, otherwise the patients have a substantially higher risk of becoming gravely ill or dying.

52.      Both Paxlovid and Molnupiravir have received Emergency Use Authorization from the U.S. Food and Drug Administration ("FDA").  Paxlovid is authorized for patients age 12 and older, and Molnupiravir is authorized for patients age 18 and older.

53.      In clinical trials, the monoclonal antibody product Sotrovimab (which is sold under the brand name Xevudy) demonstrated an 85% reduction in hospitalizations and death in patients at high risk for severe COVID-19 disease, and it is the only authorized mAb expected to be effective against the Omicron variant of the SARS-CoV-2 virus.

54.      Sotrovimab also must be administered very quickly, within 10 days of symptom onset, otherwise the patients have a substantially higher risk of becoming gravely ill or dying.

**Surge in COVID-19 Cases**

55.      The authorization of oral antivirals comes at a time of a significant surge in cases and reduced effectiveness of existing therapeutics due to the Omicron variant, which is now the predominant variant nationally.

56.      Indeed, due to the highly contagious Omicron variant, the number of Americans contracting COVID-19 is skyrocketing.

57.      As of February 11, 2022, the Centers for Disease Control and Prevention (CDC) estimated that the Omicron variant accounts for over 99% of all cases in the United States, and 99.3% of all cases in New York State. *See* https://covid.cdc.gov/covid-data-tracker/#variant-proportions (accessed Feb. 11, 2022).

58.      Moreover, the CDC has stated that it expects "a rapid increase in infections" of the Omicron variant in the United States," that this variant is "driving rapid epidemic growth," and that there likely will be "steep epidemic trajectories."  According to the CDC, the number of Omicron infections are "exponentially increasing" as a result of its increased transmissibility

VERIFIED FIRST AMENDED COMPLAINT - 11

and the variant's ability to evade immunity conferred by past infection or vaccination. Further, "given the likely increase in number of infections, the absolute numbers of people with severe outcomes could be substantial." *See* https://www.cdc.gov/coronavirus/2019-ncov/science/forecasting/mathematical-modeling-outbreak.html (accessed Feb. 11, 2022).

      59.     The CDC forecasts a steep increase nationally in new hospital admissions per day over the next few weeks due to COVID-19 infections.



      60.     Dr. Janet Woodcock, the acting commissioner of the FDA, recently testified before a Senate committee that "most people are going to get COVID."

      61.     The U.S. is averaging over 175,000 daily new COVID-19 cases, according to the CDC, and hospitalizations are hitting record levels. New York State and New York City are each averaging thousands of daily cases. *See* https://covid.cdc.gov/covid-data-tracker/#trends_dailycases (accessed Feb. 11, 2022).

      62.     The New York City Department of Health has found that with the Omicron variant, "more people [have been] infected more quickly in NYC than any other point in the

pandemic." *See* https://www1.nyc.gov/assets/doh/downloads/pdf/covid/omicron-variant-report-jan-13-22.pdf (accessed Feb. 11, 2022).

### NIH Statement about Supply Shortages and Patient Triage

63.     On or about December 23, 2021, the National Institute of Health ("NIH") issued a statement expressing that supply shortages require the administration of these therapies to patients to be triaged.  The statement read in pertinent part: "With the increase in cases of COVID-19 and the emergence of the Omicron (B.1.1.529) variant of concern, there may be logistical or supply constraints that make it impossible to offer the available therapy to all eligible patients, making patient triage necessary."

### New York State Prioritization Memo

64.     Thereafter, the New York State DOH and its Commissioner, defendant Bassett, issued a guidance memo to all New York State medical providers entitled "Prioritization of Anti-SARS-CoV-2 Monoclonal Antibodies and Oral Antivirals for the Treatment of COVID-19 During Times of Resource Limitations" ("State Prioritization Memo").  A copy of this memo is annexed hereto as Exhibit 1.

65.     The State Prioritization Memo provides that "[i]n times of limited supplies of monoclonal antibodies (mAbs) and oral antivirals (OAVs), providers should prioritize patients eligible for treatment based on their level of risk for progressing to severe COVID-19.  In addition, the most efficacious products should be prioritized for patients with the highest risk for hospitalization and death."

66.     The State Prioritization Memo then sets out a matrix with five different "risk groups" for what it described as "Tier 1" patients.

VERIFIED FIRST AMENDED COMPLAINT - 13

67.     According to the State Prioritization Memo, Tier 1 patients are those who have "mild to moderate symptoms, test positive for SARS-CoV-2," and are within 5-10 days of symptom onset.

68.     Tier 1 is broken into 5 groups, which are labeled 1A, 1B, 1C, 1D, and 1E.

69.     The highest priority Tier 1 patients are assigned to group 1A, the next highest are assigned to group 1B, and so on.

70.     The State Prioritization Memo directs that medical providers should assign each patient to one of these groups.

71.     Group 1A – the highest risk category – is for patients: (1) of any age with moderate to severe immunocompromise, regardless of vaccine status; (2) age 65 and older and not fully vaccinated with at least one risk factor for severe illness; or (3) age 65 or older that is a resident of a long-term care facility environment.

72.     Group 1B – the second highest risk category – is for patients: (1) under 65 years of age and not fully vaccinated with two or more risk factors for severe illness; or (2) over 65, not fully vaccinated, and with no risk factors.

73.     Group 1C – the third highest risk category – is for patients under 65 years of age and not fully vaccinated with at least one risk factor for severe illness.

74.     Group 1D – the fourth highest risk category – is for patients over age 65 and fully vaccinated with at least one risk factor for severe illness.

75.     Group 1E – the lowest risk category – is for patients: (1) under 65 years of age and fully vaccinated with at least one risk factor for severe illness; or (2) age 65 and older and fully vaccinated with no other risk factors.

76.     The State Prioritization Memo directs medical providers to assign each patient to a group within Tier 1 and then prioritize them within their respective groups according to each patient's number of "risk factors."

77.     With respect to "risk factors," the State Prioritization Memo references the NIH COVID-19 Treatment Guidelines, which in turn directs readers to a CDC webpage for a list of risk factors for severe COVID-19.

78.     In addition to the risk factors enumerated on the CDC website, the State Prioritization Memo expressly provides that "non-white race or Hispanic/Latino ethnicity should be considered a risk factor, as longstanding systemic health and social inequities have contributed to an increased risk of severe illness and death from COVID-19."

79.     Thus, while non-Hispanic/Latino white individuals who test positive for COVID-19 are ineligible for mAb or OAV treatments unless they also demonstrate "a medical condition or other factors that increase their risk for severe illness," similarly situated "non-white" or "Hispanic/Latino" individuals are *automatically* eligible for these life-saving antiviral treatments without having to make such a showing and regardless of the individual's medical situation.  The State Prioritization Memo's risk group matrix is as follows:

| Tier 1: Prioritization Groups for the Treatment of COVID-19 | | |
|---|---|---|
| For treatment, patients must have mild to moderate symptoms, test positive for SARS-CoV-2, and be within 10 days of symptom onset for mAbs or within 5 days for oral antivirals | | |
| **Risk Groups** | **Recommended Therapy/Approach** | **Notes on Prioritization** |
| 1A. Any age with moderate to severe immunocompromise regardless of vaccine status **or** Age 65 and older and not fully vaccinated with at least one risk factor for severe illness **or** Age 65 or older that is a resident of a long-term care facility environment | **Refer for monoclonal antibody therapy** (mAb) or prescribe Paxlovid, ideally within 24 hours of positive test Consider molnupiravir if the options above are not available | If needed, prioritize patients based on • Age • Number of risk factors |
| 1B. Under 65 years of age and not fully vaccinated with **two or more** risk factors for severe illness or over 65 and not fully vaccinated (no risk factors) | Consider mAbs or OAVs if supplies allow | If needed, prioritize patients based on • Age • Number of risk factors |
| 1C. Under 65 years of age and not fully vaccinated with at least one risk factor for severe illness | Consider mAbs or OAVs if supplies allow | If needed, prioritize patients based on • Age |
| 1D. Over age 65 and fully vaccinated with at least one risk factor for severe illness | Consider mAbs or OAVs if supplies allow | If needed, prioritize patients based on • Age • Number of risk factors • Receipt of booster • Time since last vaccination |
| 1E. Under 65 years of age and fully vaccinated with at least one risk factor for severe illness **or** Age 65 and older and fully vaccinated with no other risk factors | Consider mAbs or OAVs if supplies allow | If needed, prioritize patients based on • Age • Number of risk factors • Receipt of booster • Time since last vaccination |

## New York State's December 27, 2021 Order

80.     On December 27, 2021, the New York State DOH and its Commissioner, defendant Bassett, issued a directive to all New York State health care providers and health care facilities entitled "COVID-19 Oral Antiviral Treatments Authorized And Severe Shortage of Oral Antiviral And Monoclonal Antibody Treatment Products" ("NYS Order").  It was immediately implemented and is still in effect.  A copy of the NYS Order is annexed hereto as Exhibit 2.

81.     The NYS Order commands that all medical providers in New York must "Adhere to New York State Department of Health (NYS DOH) guidance on prioritization of high-risk patients for anti-SARS-CoV-2 therapies during this time of severe resource limitations."

82.     The NYS Order directs all New York State health care providers and health care facilities that "Non-white race or Hispanic/Latino ethnicity should be considered a risk factor" in determining eligibility for COVID-19 oral antiviral treatments and for a second time orders them to "adhere to" the framework and the race- and ethnicity-based prioritization protocol set forth in the State Prioritization Memo.

83.     The NYS Order thus directs in mandatory terms that all New York State medical providers must triage and prioritize COVID-19 patients according to the risk grouping matrix set forth in the State Prioritization Memo.

**New York City DOHMH's Health Advisory #39**

84.     The same day, December 27, 2021, defendant City, through its DOHMH, which was and is led by defendant Chokshi, issued a directive entitled "2021 Health Advisory #39" ("NYC Order") to all medical providers in the City of New York.  It was immediately implemented and is still in effect.

85.     The NYC Order commands all medical providers in the City of New York that they must "[a]dhere to New York State Department of Health guidance on prioritization of high-risk patients for anti-SARS-CoV-2 therapies during this time of severe resource limitations."  A copy of the NYC Order is annexed hereto as Exhibit 3.

86.     The NYC Order thus directs in mandatory terms that all New York City medical providers must triage and prioritize COVID-19 patients according to the risk grouping matrix set forth in the State Prioritization Memo.

87.     Further, in a section of the NYC Order entitled "Eligibility," the NYC Order directs that New York City medical providers must "[c]onsider race and ethnicity when assessing an individual's risk" for severe COVID-19 illness.

**Effect of the NYS and NYC Orders**

88.     According to the NYS and NYC Orders – both of which expressly incorporate and adopt the State Prioritization Memo's five risk groups, recommended therapies, and risk factors – being "non-white" or "Hispanic/Latino" serves to elevate a patient's risk status, place them in a higher risk category, and give them preference over similarly situated "white" patients – such as Plaintiff Stewart and Plaintiff FAIR's members classified as white – for access to the limited supply of lifesaving COVID-19 treatments and therapies.  This creates a racial hierarchy in which persons classified as non-Hispanic white are always at the bottom.

89.     By way of illustration, imagine that two patients, one white and one black, present to the same health care provider with mild to moderate symptoms of COVID-19.  Both test positive for SARS-CoV-2, and both are within 5 days of symptom onset.  Both patients are also under 65 years of age and are fully vaccinated.  According to the NYS and NYC Orders, the patient classified as non-Hispanic white would not be placed in any prioritized risk group in Tier 1, while the black patient would be placed in Tier 1 risk group 1E, solely because he or she is a "non-white race." As a member of the higher risk group, the black patient would be given priority over the patient classified as non-Hispanic white for mAbs or OAV treatment. This treatment advantage is not based on any objective medical need or scientific study, but solely on racial and ethnic discrimination.

90.     Similarly, consider a situation where two 70-year-old patients, one classified as non-Hispanic white and one of Hispanic ethnicity, present in a doctor's office with mild to moderate symptoms of COVID-19.  Both are fully vaccinated, both test positive for SARS-CoV-2, and both are within 5 days of symptom onset.  Neither has any underlying medical conditions.  The patient classified as non-Hispanic white would be placed in category 1E, the

lowest risk group, while the Hispanic patient – solely because of her ethnicity – would be placed in category 1D, a higher risk group. The Hispanic patient, like the black patient in the previous example, would be given priority over the patient classified as non-Hispanic white for mAbs and OAV treatment simply because of her ethnic heritage.

91.     Under Defendants' state and municipal policies, even if two patients each had moderate to severe immunocompromise, and therefore were both placed in risk group 1A, the non-white or Hispanic/Latino patient would be prioritized over a patient classified as non-Hispanic white for no reason other than their skin color and/or ancestry.

92.     The same holds true for each of the risk groups, since both the NYS and NYC Orders direct providers to adhere to the State Prioritization Memo, which in turn directs that providers prioritize each patient within each risk group according to the patient's number of "risk factors."

93.     Solely because of their skin color and/or ethnicity, patients classified as non-white or Hispanic/Latino will always be assigned one more risk factor than identically situated white patients and therefore, under both Orders, the non-white or Hispanic/Latino patient will always be prioritized ahead of Plaintiff Stewart and Plaintiff FAIR's members classified as white when it comes to receiving life-saving therapies and prophylaxis against COVID-19.

94.     Patients younger than 65 with no risk factors but who happen to have been born non-Hispanic white – such as Plaintiff Stewart – are always guaranteed to be at the end of the line.

95.     This is not because any race or ethnicity has a medical susceptibility or genetic predisposition to severe COVID-19 disease, but because, according to the NYS and NYC Orders, such overt discrimination is warranted because of "longstanding systemic health and

social inequities" that have been visited on those who are "non-white" and "Hispanic/Latino," as well as those who are "Black, Indigenous, and People of Color."

96.     Moreover, Defendants' illegal policies of race- and ancestry-based rationing promotes a vile and evil canard, rooted in eugenics, that non-white races and ethnicities are more sickly, weak, and infectious simply because of their skin color and      national origin. Defendants' policies pathologize darker skin colors by likening them to a disease or other negative condition. A higher level of melanin, however, is not a comorbidity.

97.     Further, while clinical studies demonstrate that mAbs and OAVs – all of which are experimental therapies without FDA approval – are extremely effective at treating patients with mild to moderate COVID-19 who, due to age and underlying medical conditions, are at high risk for progression to severe disease, they often are unnecessary for younger patients without underlying medical comorbidities.

98.     Nevertheless, young or otherwise healthy "non-white" and "Hispanic/Latino" persons are being prescribed and administered these experimental medicines pursuant to the NYS and NYC Orders – solely because of the color of their skin and their ethnic appearance – even though they likely do not need them and stand to gain no benefit from them.  In contrast, similarly situated young and otherwise healthy "white" patients are not offered these experimental therapies, and therefore are not being put at risk for any of their as yet unknown harmful effects.

99.     Thus, under the NYS Order and NYC Order, persons of color and ethnic minorities, such as Plaintiff FAIR's members classified as non-white, are being used as test subjects and are disproportionately bearing the risk of future adverse consequences from these experimental therapeutics.

100.     Simply put, through the NYS Order and the NYC Order, Defendants are purposefully engaging in an overtly discriminatory, unlawful and unconstitutional racial- and ethnic-preference medical treatment policy that quite literally has life-or-death stakes.

101.     Plaintiffs' injuries are traceable to the NYS Order, which is enforced by defendant Bassett, and the NYC Order, which is enforced by defendants City, DOHMH, and Chokshi.

## FIRST CLAIM

**VIOLATION OF 42 U.S.C. § 1983 – EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT**

102.     Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth at length herein.

103.     Defendants, acting under color of New York law, have adopted policies pursuant to which Plaintiff Stewart and Plaintiff FAIR's members are being discriminated against because of their race and ethnicity.

104.     Plaintiff Stewart and Plaintiff FAIR's members are being irreparably harmed by Defendants' denial of their right to equal protection and the fear and apprehension caused by such denials, and they will continue to be irreparably harmed unless Defendants' unlawful policies and conduct are enjoined.

105.     Plaintiff Stewart, Plaintiff FAIR, and Plaintiff FAIR's members have no adequate remedy at law.

## SECOND CLAIM

**DISCRIMINATION UNDER 42 U.S.C. § 1981**

106.     Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth at length herein.

107.    Defendants' acts, practices, and policies described herein constitute intentional discrimination against Plaintiff Stewart and Plaintiff FAIR's members on the basis of their race, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

108.    Plaintiff Stewart and Plaintiff FAIR's members are being irreparably harmed by Defendants' flagrant discrimination and the fear and apprehension caused by such discrimination, and they will continue to be irreparably harmed unless Defendants' unlawful policies and conduct are enjoined.

109.    Plaintiff Stewart, Plaintiff FAIR, and Plaintiff FAIR's members have no adequate remedy at law.

## THIRD CLAIM

### VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

110.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth at length herein.

111.    42 U.S.C. § 2000d provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

112.    Defendants receive federal financial assistance to provide therapies, including mAb products and OAVs, for the treatment of COVID-19.

113.    Defendants' acts, practices, and policies described herein also violate Title VI because they mandate that all medical providers within the City and State of New York, including those who receive federal financial assistance to provide therapies for the treatment of COVID-19, violate Title VI by discriminating on the basis of race, color and national origin.

114.    Plaintiff Stewart and Plaintiff FAIR's members are being irreparably harmed by Defendants' flagrant discrimination and the fear and apprehension caused by such discrimination, and they will continue to be irreparably harmed unless Defendants' unlawful policies and conduct are enjoined.

115.    Plaintiff Stewart, Plaintiff FAIR, and Plaintiff FAIR's members have no adequate remedy at law.

## FOURTH CLAIM

### VIOLATION OF SECTION 1557 OF THE AFFORDABLE CARE ACT

116.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth at length herein.

117.    Section 1557 of the Patent Protection and Affordable Care Act, codified at 42 U.S.C. § 18116, provides, among other things, that no individual shall be subjected to discrimination on the grounds of race, color or national origin under any health program or activity, any part of which is receiving federal financial assistance.

118.    Defendants receive federal financial assistance to provide therapies, including mAb products and OAVs, for the treatment of COVID-19.

119.    Defendants' acts, practices, and policies described herein also violate Section 1557 because they mandate that all medical providers within the City and State of New York, including those who receive federal financial assistance to provide therapies for the treatment of COVID-19, violate Section 1557 by discriminating on the basis of race, color and national origin.

120.    Plaintiff Stewart and Plaintiff FAIR's members are being irreparably harmed by Defendants' flagrant discrimination and the fear and apprehension caused by such

discrimination, and they will continue to be irreparably harmed unless Defendants' unlawful policies and conduct are enjoined.

121.    Plaintiff Stewart, Plaintiff FAIR, and Plaintiff FAIR's members have no adequate remedy at law.

## **FIFTH CLAIM**

### **VIOLATION OF ARTICLE I, § 11 OF THE NEW YORK STATE CONSTITUTION**

122.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth at length herein.

123.    Article I, § 11 of the New York State Constitution provides that "No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state."

124.    That by virtue of the aforementioned acts, Defendants have violated the rights of Plaintiff Stewart and Plaintiff FAIR's members under the New York State Constitution to equal protection of the laws and to be free of racial and ethnic discrimination.

125.    Plaintiff Stewart and Plaintiff FAIR's members are being irreparably harmed by Defendants' flagrant discrimination and the fear and apprehension caused by such discrimination, and they will continue to be irreparably harmed unless Defendants' unlawful policies and conduct are enjoined.

126.    Plaintiff Stewart, Plaintiff FAIR, and Plaintiff FAIR's members have no adequate remedy at law.

                              *       *       *

# <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs respectfully request that this Court enter a Judgment:

a.  Declaring that Defendants' policies requiring that a patient's race and ethnicity be used to determine priority for oral antiviral and monoclonal antibody treatments for COVID-19 is unconstitutional because it violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution;

b.  Declaring that Defendants' policies requiring that a patient's race and ethnicity be used to determine priority for oral antiviral and monoclonal antibody treatments for COVID-19 violate 42 U.S.C. § 1981;

c.  Declaring that Defendants' policies requiring that a patient's race and ethnicity be used to determine priority for oral antiviral and monoclonal antibody treatments for COVID-19 violate Title VI's prohibition against discrimination based on race, color or national origin;

d.  Declaring that Defendants' policies requiring that a patient's race and ethnicity be used to determine priority for oral antiviral and monoclonal antibody treatments for COVID-19 violate § 1557 of the Affordable Care Act, which prohibits discrimination based on race, color or national origin;

e.  Declaring that Defendants' policies requiring that a patient's race and ethnicity be used to determine priority for oral antiviral and monoclonal antibody treatments for COVID-19 violate Article I, § 11 of the New York State Constitution;

f.  Permanently enjoining Defendants from enforcing any policy requiring that a patient's race and ethnicity be used to determine priority for oral antiviral and monoclonal antibody treatments for COVID-19;

g.  Awarding Plaintiffs nominal damages;

h.  Awarding Plaintiffs attorneys' fees and other litigation costs reasonably incurred in this action pursuant to 42 U.S.C. § 1988;

i.  Granting Plaintiffs such other relief as this Court deems just and proper.

Dated this 11th day of February, 2022

Ameer Benno, Esq.
BENNO & ASSOCIATES P.C.
30 Wall Street, 8th Floor
New York, NY 10005
Tel.: (212) 227-9300
abenno@BennoLaw.com

## **VERIFICATION**

I, LETITIA KIM, am the Managing Director of the Legal Network of the Foundation Against Intolerance & Racism, Inc., the plaintiff in this action, and as such I am legally authorized to speak on its behalf. I understand that I am doing so in this verification. I have read the foregoing VERIFIED FIRST AMENDED COMPLAINT, I know the contents thereof, and I attest that the allegations contained within the VERIFIED FIRST AMENDED COMPLAINT are true and correct based upon my personal knowledge (unless otherwise indicated). If called upon to testify as to their truthfulness, I would and could do so competently. I declare under penalties of perjury and under the laws of the United States that the foregoing statements are true and correct.


Dated: San Francisco, California
      February 11, 2022



                         LETITIA KIM
                         Foundation Against Intolerance & Racism, Inc.

## **VERIFICATION**

I, BENJAMIN STEWART, am over the age of 18 and am a plaintiff in this action.  I have read the foregoing VERIFIED FIRST AMENDED COMPLAINT, I know the contents thereof, and I attest that the allegations contained within the VERIFIED FIRST AMENDED COMPLAINT are true and correct based upon my personal knowledge (unless otherwise indicated). If called upon to testify as to their truthfulness, I would and could do so competently.  I declare under penalties of perjury and under the laws of the United States that the foregoing statements are true and correct.

Dated: Queens, New York
         February 11, 2022

_____
BENJAMIN STEWART