UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FOUNDATION AGAINST INTOLERANCE & RACISM, INC. and BENJAMIN STEWART,<br><br>                *Plaintiffs*,<br><br>  -against-<br><br>THE CITY OF NEW YORK; THE NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE; DAVE A. CHOKSHI, as Commissioner of the New York City Department of Health and Mental Hygiene; AND MARY T. BASSETT, individually and in her official capacity as Commissioner of the New York State Department of Health,<br><br>              *Defendants*. | Index No.:  22-CV-528 (KPF) (JW) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION**

Plaintiffs Foundation Against Intolerance & Racism, Inc. and Benjamin Stewart, by and through their attorneys, hereby request that this Honorable Court issue a temporary restraining order and preliminary injunction for the reasons set forth in the attached Memorandum of Law.

Dated:      New York, New York
             February 23, 2022

                    Yours, etc.,

                    BENNO & ASSOCIATES P.C.

                    By:    /S/ Ameer Benno
                           AMEER BENNO, Esq. (AB-1130)
                    30 Wall Street, 8th Floor
                    New York, New York 10005
                    Tel.:  (212) 227-9300
                    Email: abenno@bennolaw.com

                    *Attorneys for Plaintiffs*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............... ..…………………………………….……………….....ii

PRELIMINARY STATEMENT ...........…………………………………………….…………...1

STATEMENT OF FACTS ...........…………………………………………………………......1

ARGUMENT. .………………………………………………………………….…………….…9

POINT........... …………………………………………………………………….………….…9

    A. STANDING ...........................................................................................10

        A. Plaintiff Benjamin Stewart......................................................10

        B. Plaintiff FAIR .........................................................................12

    B. LIKELIHOOD OF SUCCESS ..................…………………………………15

    C. IRREPARABLE HARM ....................…………………………………22

    D. BALANCE OF HARMS / PUBLIC INTEREST ...…………………………24

CONCLUSION.........…………………………………….…………………….....25

## **TABLE OF AUTHORITIES**

Page

### **U.S. Supreme Court Cases**

*Adarand Constructors v. Pena,*
 515 U.S. 200 (1995) ................................................................................................ 17, 18, 23

*Bowen v. City of New York,*
 476 U.S. 467 (1986) ................................................................................................ 21

*Bush v. Vera,*
 517 U.S. 952 (1996) ................................................................................................ 17, 20

*City of Cleburne v. Cleburne Living Ctr.,*
 473 U.S. 432 (1985) ................................................................................................ 18, 19

*Connick v. Thompson,*
 563 U.S. 51 (2011) .................................................................................................. 16

*Ex Parte Young,*
 209 U.S. 123 (1908) ................................................................................................ 16

*Elrod v. Burns,*
 427 U.S. 347 (1976) ................................................................................................ 20

*Fisher v. Univ. of Tex.,*
 570 U.S. 297 (2013) ................................................................................................ 17, 23

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
 528 U.S. 167 (2000) ................................................................................................ 15

*Grutter v. Bollinger,*
 539 U.S. 306 (2003) ................................................................................................ 19

*Havens Realty Corp. v. Coleman,*
 455 U.S. 363 (1982) ................................................................................................ 14

*Heck v. Humphrey,*
 512 U.S. 477 (1994) ................................................................................................ 15

*Hunt v. Washington State Apple Advertising Comm'n,*
 432 U.S. 333 (1977) ................................................................................................ 14

*Jett v. Dallas Indep. Sch. Dist.*,
    491 U.S. 701 (1989)........................................................................................ 15

*Korematsu v. United States*,
    323 U.S. 214 (1944)........................................................................................ 17

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)........................................................................................ 12

*McDonald v. Santa Fe Trail Transp. Co.*,
    427 U.S. 273, 295 (1976)................................................................................ 20

*Monell v. Dep't of Soc. Servs*,
    436 U.S. 658 (1978)........................................................................................ 16

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*,
    684 F.3d 286 (2d Cir. 2012)............................................................................ 14

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
    *508 U.S. 656 (1993)*...................................................................................... 12

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007).................................................................................. 17, 18

*Personnel Administrator of Mass. v. Feeney*,
    442 U.S. 256 (1979)........................................................................................ 18

*Rice v. Cayetano*,
    528 U.S. 495 (2000)........................................................................................ 17

*Richmond v. J. A. Croson Co.*,
    488 U.S. 469 (1989)............................................................................... *passim*

*Shaw v. Reno*,
    509 U.S. 630 (1993).................................................................................. 11, 18

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017).................................................................................... 11

*United Jewish Organizations of Williamsburgh, Inc. v. Carey*,
    430 U.S. 144 (1977)........................................................................................ 22

*University of Calif. Regents v. Bakke*,
    438 U.S. 265 (1978).................................................................................. 18, 21

*Warth v. Seldin,*
   422 U.S. 490 (1975)......................................................................................... 14

*Washington v. Davis,*
   426 U.S. 229 (1976)......................................................................................... 16

*Wygant v. Jackson Board of Educ.,*
   476 U.S. 267 (1986) ........................................................................................ 16

**Federal and State Cases**

*Am. Civil Liberties Union v. Ashcroft,*
   322 F.3d 240 (3d Cir. 2003)............................................................................. 23

*Associated Gen. Contractors v. New Haven,*
   41 F.3d 62 (2d Cir. 1994)................................................................................. 21

*Basank v. Decker,*
   449 F. Supp. 3d 205 (S.D.N.Y. 2020).............................................................. 22

*Baur v. Veneman,*
   352 F.3d 625 (2d Cir. 2003)............................................................................. 13

*Benihana, Inc. v. Benihana of Tokyo, LLC,*
   784 F.3d 887 (2d Cir. 2015)............................................................................. 11

*Brooklyn Ctr. for Independence of the Disabled v. Bloomberg,*
   290 F.R.D. 409 (S.D.N.Y. 2012) ..................................................................... 13

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio,*
   364 F. Supp. 3d 253 (S.D.N.Y. 2019).............................................................. 13

*Coronel v. Decker,*
   449 F. Supp. 3d 274 (S.D.N.Y. 2020).............................................................. 23

*Denney v. Deutsche Bank AG,*
   443 F.3d 253 (2d Cir. 2006)............................................................................. 12

*Dorsey v. Stuyvesant Town Corp.,*
   299 N.Y. 512 (1949) ........................................................................................ 16

*Hayden v. Cnty. of Nassau,*
   180 F.3d 42 (2d Cir. 1999)............................................................................... 17

*Innovative Health Systems, Inc. v. City of White Plains,*
   117 F.3d 37 (2d Cir. 1997)............................................................................... 21

*Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*,
  596 F.2d 70 (2d Cir 1979) .................................................................................. 21

*Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*,
  438 F.3d 195 (2d Cir. 2006) .............................................................................. 17

*Jones v. Town of E. Haven*,
  691 F.3d 72 (2d Cir. 2012) ............................................................................... 16

*Kiryas Joel All. v. Vill. of Kiryas Joel*,
  495 Fed. Appx. 183 (2d Cir. 2012) .................................................................. 11

*Local 1814, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n*,
  965 F.2d 1224 (2d Cir. 1992) ........................................................................... 10

*Mays v. Dart*,
  453 F. Supp. 3d 1074 (N.D. Ill. 2020) ............................................................. 22

*Mitchell v. Cuomo*,
  748 F.2d 804 (2d Cir. 1984) .............................................................. 11, 17, 20

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*,
  684 F.3d 286 (2d Cir. 2012) ............................................................................. 14

*New York Progress & Prot. PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013) ............................................................................. 23

*New York State Citizens' Coalition for Children v. Velez*,
  629 Fed. Appx. 92 (2d Cir. 2015) .................................................................... 15

*New York v. Sullivan*,
  906 F.2d 910 (S.D.N.Y. 1990) ......................................................................... 21

*New York v. U.S. Dep't of Agric.*,
  454 F. Supp. 3d 297 (S.D.N.Y. 2020) ............................................................. 11

*New York. v. Heckler*,
  742 F.2d 729 (2d Cir. 1984) ............................................................................. 21

*Nnebe v. Daus*,
  644 F.3d 147 (2d Cir. 2011) ....................................................................... 14, 15

*Peters v. Jenney*,
  327 F.3d 307 (4th Cir. 2003) ..................................................................... 14, 15

*Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*,
   337 F. Supp. 3d 308 (S.D.N.Y. 2018)...................................................................... 23

*Ragin v. Harry Macklowe Real Estate Co.*,
   6 F.3d 898 (2d Cir. 1993)............................................................................................ 15

*Rural & Migrant Ministry v. United States EPA*,
   510 F. Supp. 3d 138 (S.D.N.Y. 2020)........................................................................ 13

*Shapiro v. Cadman Towers, Inc.*,
   51 F.3d 328 (2d Cir. 1995)......................................................................................... 21

*Vitolo v. Guzman*,
   999 F.3d 353 (6th Cir. 2021) .................................................................................22-23

## Statutes

42 U.S.C. § 1981................................................................................................... 15, 20

42 U.S.C. § 1983................................................................................................... 13-16

42 U.S.C. § 2000d....................................................................................................... 23

42 U.S.C. § 18116........................................................................................................ 23

42 U.S.C. § 18116(a) ................................................................................................... 15

## Rules

Fed. R. Evid. 201(b)(2) ............................................................................................... 23

## Constitutional Provisions

U.S. Const. amend. XIV § 1 ........................................................................................ 16

N.Y. Const., art I, § 11 ................................................................................................. 16

## Other Authorities

11 C. Wright & A. Miller, *Federal Practice and Procedure* ....................................... 11

PRELIMINARY STATEMENT

Plaintiffs Foundation Against Intolerance & Racism, Inc. ("FAIR") and Benjamin Stewart submit this memorandum of law in support of their motion to enjoin Defendants from enforcing portions of two identical directives dated December 27, 2021 – one issued by the New York State Department of Health ("DOH") and the other issued by the New York City Department of Health and Mental Hygiene ("DOHMH") – that give increased priority for scarce COVID-19 oral antiviral and monoclonal antibody therapy treatments to "non-white race or Hispanic/Latino ethnicity" solely because of their skin color and ancestry. Under these policies, patients who are classified as non-Hispanic/Latino white cannot obtain such treatments in New York when they contract COVID-19 unless they demonstrate a medical condition or other factors that increase their risk for severe illness from the virus, but non-white and Hispanic/Latino patients are not required to make such a showing.  And, even if they make such a showing, Plaintiff Stewart and Plaintiff FAIR's members classified as non-Hispanic white will be given the lowest possible priority because of their skin color and ethnicity. These policies are blatantly discriminatory and work grave incursions on the Fourteenth Amendment's guarantee of Equal Protection.

STATEMENT OF FACTS[1]

The federal Food and Drug Administration ("FDA") recently approved oral antiviral therapies ("OAV") to treat patients with mild-to-moderate COVID-19 who are at high risk for progression to severe disease, regardless of vaccination status (Exh. 1 ¶ 47 (Verified First Amended Complaint)). Among these are monoclonal antibody products and oral antivirals that are extremely effective at preventing and treating COVID-19 (*Id.* at ¶ 48).  The oral antiviral

---

[1] Unless otherwise indicated, parenthetical references preceded by "Exh." are to the corresponding exhibit annexed to the Declaration of Ameer Benno, dated February 14, 2022 ("Benno Decl."), filed in support of this motion.

Paxlovid demonstrated an 88% reduction in hospitalizations and death in patients at high risk for severe COVID-19 disease, and the oral antiviral Molnupiravir demonstrated a 30% reduction in hospitalizations and death in patients at high risk for severe COVID-19 disease (*Id.* at ¶¶ 49-50). Both of these oral antivirals must be administered very quickly, within five days of symptom onset, otherwise the patients have a substantially higher risk of becoming gravely ill or dying (*Id.* at ¶ 51).

Similarly, the monoclonal antibody product ("mAb") Sotrovimab demonstrated an 85% reduction in hospitalizations and death in clinical trials in patients at high risk for severe COVID-19 disease, and it is the only authorized mAb expected to be effective against the Omicron variant of the SARS-CoV-2 virus. Sotrovimab also must be administered very quickly, within 10 days of symptom onset, otherwise the patients have a substantially higher risk of becoming gravely ill or dying (*Id.* at ¶¶ 53-54).[2]

The authorization of these therapies comes at a time of a significant surge in cases and reduced effectiveness of existing therapeutics due to the Omicron variant, which is now the predominant variant nationally (*Id.* at ¶ 55). Indeed, due to the highly contagious Omicron variant, the number of Americans contracting COVID-19 has skyrocketed (*Id.* at ¶ 56). In fact, the Centers for Disease Control and Prevention ("CDC") recently estimated that the Omicron variant accounts greater than 99% of all COVID-19 cases in the United State (*Id.* at ¶ 57; *see* https://covid.cdc.gov/covid-data-tracker/#variant-proportions (accessed Feb. 13, 2022)).

Moreover, the CDC has cautioned that the Omicron variant is more transmissible than the Delta or ancestral strains of COVID-19, and that Omicron also evades immunity conferred by past infection or vaccination (Exh. 1 at ¶ 58). According to the CDC, Omicron is "extremely

---

[2]   Paxlovid, Molnupiravir and Sotrovimab have received Emergency Use Authorization from the FDA. Paxlovid and Sotrovimab are authorized for patients age 12 and older, and Molnupiravir is authorized for patients age 18 and older (Exh. 1 at ¶ 52; *see also* https://www.fda.gov/media/149532/download (accessed Feb. 8, 2022)).

contagious" and "community transmission [of Omicron] is high nationwide" (*see* https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html) (accessed Feb. 8, 2022)).  The CDC has noted that "given the likely increase in number of infections, the absolute numbers of people with severe outcomes could be substantial" (Exh. 1 at ¶ 58).  To date, there have been over 900,000 COVID-19 deaths in the United States (*see* https://covid.cdc.gov/covid-data-tracker/#cases_deathsper100klast7days) (accessed Feb. 8, 2022)).  New York City is averaging over 2,000 daily cases, and the rest of New York State is averaging of 3,000 daily cases (*see* https://covid.cdc.gov/covid-data-tracker/#trends_dailycases) (accessed Feb. 8, 2022)).

### NIH Statement about Supply Shortages and Patient Triage

On or about December 23, 2021, the National Institute of Health issued a statement expressing that supply shortages require the administration of these therapies to patients to be triaged.  The statement read in pertinent part: "With the increase in cases of COVID-19 and the emergence of the Omicron (B.1.1.529) variant of concern, there may be logistical or supply constraints that make it impossible to offer the available therapy to all eligible patients, making patient triage necessary" (Exh. 1 at ¶ 63).

### New York State Prioritization Memo

Thereafter, the New York State Department of Health issued a guidance memo to all New York State medical providers entitled "Prioritization of Anti-SARS-CoV-2 Monoclonal Antibodies and Oral Antivirals for the Treatment of COVID-19 During Times of Resource Limitations" ("State Prioritization Memo").

The State Prioritization Memo provides that "[i]n times of limited supplies of monoclonal antibodies (mAbs) and oral antivirals (OAVs), providers should prioritize patients eligible for treatment based on their level of risk for progressing to severe COVID-19 (Exh. 2 at 1.  In addition, the most efficacious products should be prioritized for patients with the highest risk for

hospitalization and death." The State Prioritization Memo then sets out a matrix with five different "risk groups" for what it described as "Tier 1" patients (*Id.* at 2).

According to the State Prioritization Memo, Tier 1 patients are those who have "mild to moderate symptoms, test positive for SARS-CoV-2," and are within 5-10 days of symptom onset. Tier 1 is broken into 5 groups, which are labeled 1A, 1B, 1C, 1D, and 1E.  The highest priority Tier 1 patients are assigned to group 1A, the next highest are assigned to group 1B, and so on.  The State Prioritization Memo directs that medical providers should assign each patient to one of these groups (*Id.*).  The groups are:

- **Group 1A** – the highest risk category – is for patients: (1) of any age with moderate to severe immunocompromise, regardless of vaccine status; (2) age 65 and older and not fully vaccinated with at least one risk factor for severe illness; or (3) age 65 or older that is a resident of a long-term care facility environment.

- **Group 1B** – the second highest risk category – is for patients: (1) under 65 years of age and not fully vaccinated with two or more risk factors for severe illness; or (2) over 65, not fully vaccinated, and with no risk factors.

- **Group 1C** – the third highest risk category – is for patients under 65 years of age and not fully vaccinated with at least one risk factor for severe illness.

- **Group 1D** – the fourth highest risk category – is for patients over age 65 and fully vaccinated with at least one risk factor for severe illness.

- **Group 1E** – the lowest risk category – is for patients: (1) under 65 years of age and fully vaccinated with at least one risk factor for severe illness; or (2) age 65 and older and fully vaccinated with no other risk factors.

(*Id.*).

The State Prioritization Memo directs medical providers to assign each patient to one of these groups and then to prioritize them within their respective groups according to each patient's number of "risk factors." With respect to "risk factors," the State Prioritization Memo references the NIH COVID-19 Treatment Guidelines, which in turn directs readers to a CDC webpage for a list of risk factors for severe COVID-19. In addition to the risk factors enumerated on the CDC website, the State Prioritization Memo expressly provides that "non-white race or

Hispanic/Latino ethnicity should be considered a risk factor, as longstanding systemic health and social inequities have contributed to an increased risk of severe illness and death from COVID-19" (*Id.*).

Thus, while individuals classified as non-Hispanic white who test positive for COVID-19 are ineligible for mAb or OAV treatments unless they also demonstrate "a medical condition or other factors that increase their risk for severe illness," similarly situated "non-white" or "Hispanic/Latino" individuals are automatically eligible for these life-saving antiviral treatments without having to make such a showing and regardless of the individual's medical situation (*Id.*). The State Prioritization Memo's risk group matrix is as follows:

**Tier 1: Prioritization Groups for the Treatment of COVID-19**
For treatment, patients must have mild to moderate symptoms, test positive for SARS-CoV-2, and be within 10 days of symptom onset for mAbs or within 5 days for oral antivirals

| Risk Groups | Recommended Therapy/Approach | Notes on Prioritization |
|---|---|---|
| 1A. Any age with moderate to severe immunocompromise regardless of vaccine status **or** Age 65 and older and not fully vaccinated with at least one risk factor for severe illness **or** Age 65 or older that is a resident of a long-term care facility environment | **Refer for monoclonal antibody therapy** (mAb) or prescribe Paxlovid, ideally within 24 hours of positive test. Consider molnupiravir if the options above are not available | If needed, prioritize patients based on • Age • Number of risk factors |
| 1B. Under 65 years of age and not fully vaccinated with **two or more** risk factors for severe illness or over 65 and not fully vaccinated (no risk factors) | Consider mAbs or OAVs if supplies allow | If needed, prioritize patients based on • Age • Number of risk factors |
| 1C. Under 65 years of age and not fully vaccinated with at least one risk factor for severe illness | Consider mAbs or OAVs if supplies allow | If needed, prioritize patients based on • Age |
| 1D. Over age 65 and fully vaccinated with at least one risk factor for severe illness | Consider mAbs or OAVs if supplies allow | If needed, prioritize patients based on • Age • Number of risk factors • Receipt of booster • Time since last vaccination |
| 1E. Under 65 years of age and fully vaccinated with at least one risk factor for severe illness **or** Age 65 and older and fully vaccinated with no other risk factors | Consider mAbs or OAVs if supplies allow | If needed, prioritize patients based on • Age • Number of risk factors • Receipt of booster • Time since last vaccination |

### New York State's December 27, 2021 Order

On December 27, 2021, the New York State DOH and its Acting Commissioner, defendant Bassett, issued a directive to all New York State health care providers and health care facilities entitled "COVID-19 Oral Antiviral Treatments Authorized And Severe Shortage Of

Oral Antiviral And Monoclonal Antibody Treatment Products" (hereinafter, "NYS Order").  It was immediately implemented and is still in effect (Exh. 3).

The NYS Order directs that all New York State health care providers and health care facilities must consider "non-white race or Hispanic/Latino ethnicity" a "risk factor" in determining eligibility for COVID-19 oral antiviral treatments, and it commands them to "adhere to" the framework and the race- and ethnicity-based prioritization protocol set out in the State Prioritization Memo (*Id.*).

### NYC DOHMH's Health Advisory #39

On or about December 27, 2021, the City of New York, through its Department of Health and Mental Hygiene ("DOHMH"), issued a directive entitled "2021 Health Advisory #39" (hereinafter, the "NYC Order") to all medical providers in the City of New York.  It was immediately implemented and is still in effect (Exh. 4).

The NYC Order commands all medical providers in the City of New York to "adhere to New York State Department of Health guidance on prioritization of high risk patients for anti-SARS-CoV-2 therapies during this time of severe resource limitations." It thus directs, in mandatory terms, that all New York City medical providers triage and prioritize COVID-19 patients according to risk grouping matrix set forth in the State Prioritization Memo (*Id.*).[3] Further, in a section of the NYC Order entitled "Eligibility," the NYC Order directs that New York City medical providers must "[c]onsider race and ethnicity when assessing an individual's risk" for severe COVID-19 illness (*Id.*).

---

[3]  As board-certified Emergency Medicine physician Carrie D. Mendoza, M.D. explains in her accompanying declaration, "[i]It is common, standard, and expected practice for physicians to follow medical and health guidelines and advisories that impact their medical field and that are issued by the health department in the state and city in which they practice. Accordingly, a physician would be compelled to follow the [NYS and NYC Orders] and prioritize their COVID-19 patients for oral antivirals and monoclonal antibodies based on race and ethnicity" (Exh. 5 at ¶ 17).

**Effect of the NYS and NYC Orders**

According to the NYS and NYC Orders – both of which expressly incorporate and adopt the State Prioritization Memo's five risk groups, recommended therapies, and risk factors – being "non-white" or "Hispanic/Latino" serves to elevate a patient's risk status, place them in a higher risk category, and give them preference over similarly situated non-Hispanic "white" patients for access to the limited supply of lifesaving COVID-19 treatments and therapies.  This creates a racial hierarchy in which persons who are classified as non-Hispanic white are always at the bottom.

By way of illustration, imagine that two patients, one white and one black, present to the same health care provider with mild to moderate symptoms of COVID-19.  Both test positive for SARS-CoV-2, and both are within 5 days of symptom onset.  Both patients are also under 65 years of age and are fully vaccinated.  According to the NYS and NYC Orders, the patient classified as non-Hispanic white would not be placed in any prioritized risk group, while the black patient would be placed in risk group 1E, solely because he or she is a "non-white race." As a member of the higher risk group, the black patient would be given priority over the patient classified as non-Hispanic white for mAbs or OAV treatment. This treatment advantage is not based on any objective medical need or scientific study, but solely on racial and ethnic discrimination (Exh. 1 at ¶ 89).

Under Defendants' policies, even if two patients each had moderate to severe immunocompromise, and therefore were both placed in risk group 1A, the non-white or Hispanic/Latino patient would be prioritized over a patient classified as non-Hispanic white for no reason other than their skin color and/or ancestry. The same holds true for each of the risk groups, since the NYS and NYC Orders direct providers to adhere to the State Prioritization Memo, which in turn directs that providers prioritize each patient within each risk group

according to the patient's number of "risk factors." Solely because of their skin color and/or ethnicity, patients classified as non-white or Hispanic/Latino will always be assigned one more risk factor than identically situated white patients and therefore, under both Orders, the non-white or Hispanic/Latino patient will always be prioritized ahead of Plaintiff Stewart and Plaintiff FAIR's members classified as white when it comes to receiving life-saving therapies and prophylaxis against COVID-19 (*Id.* at ¶¶ 91-93).

Patients younger than 65 with no risk factors but who happened to have been born non-Hispanic white – such as Plaintiff Stewart – are always guaranteed to be at the end of the line. This is not because any race or ethnicity has a medical susceptibility or genetic predisposition to severe COVID-19 disease, but because, according to the NYS and NYC Orders, the City of New York believes that such discrimination is warranted because of "longstanding systemic health and social inequities" that have been visited on those who are "non-white" and "Hispanic/Latino," as well as those who are "Black, Indigenous, and People of Color" (*Id.* at ¶¶ 94-95).

## Declaration of Carrie D. Mendoza, M.D.

In support of this motion, Plaintiffs have submitted the declaration of physician Carrie D. Mendoza, M.D.  (Exh. 5).  A graduate of the Pritzker School of Medicine at the University of Chicago, Dr. Mendoza is a duly-licensed and Board-certified Emergency Medicine physician and has worked in that capacity for over 20 years (*Id.* at ¶ 1).

In her declaration, Dr. Mendoza explains that a patient's race and ethnicity do not, by themselves, put that patient at a higher risk of severe illness or death from COVID-19 (*Id.* at ¶ 16).  Although some medical conditions may, in some cases, correlate with race or ethnicity – such as Sickle Cell Disease or Tay-Sachs Disease – "there is no known medical basis for

concluding that a specific skin color, race, or ethnicity itself places a patient at a higher risk of serious severe illness or death from COVID-19" (*Id*.).

Further, while certain racial and ethnic groups may, when considered as a *group*, have a higher or lower incidence of some of the known COVID-19 comorbidities, the standard of care in Emergency Medicine requires physicians to examine each patient *individually* in a clinical setting and to take a detailed history from them (*Id*. at ¶ 17). This process allows the physician to identify any relevant comorbidities and to take them into account in arriving at an appropriate treatment plan for that patient (*Id*.) Thus, explains Dr. Mendoza, "[t]here is therefore no justifiable medical need for automatically assigning risk factors based on a patient's race and/or ancestry" (*Id*.).

<u>ARGUMENT</u>

<u>POINT</u>

<u>PLAINTIFFS SATISFY ALL OF THE REQUIREMENTS FOR A
TEMPORARY RESTRAINING ORDER AND A PRELIMINARY
INJUNCTION</u>

In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction. *Local 1814, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n,* 965 F.2d 1224, 1228 (2d Cir. 1992) (the "standards which govern consideration of an application for a temporary restraining order ... are the same standards as those which govern a preliminary injunction"). To obtain a preliminary injunction, a plaintiff must establish: (1) "a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (2) "a likelihood of irreparable injury in the absence of an injunction"; (3) that the balance of hardships "tips in the plaintiff's favor"; and (4) that the injunction is not adverse to the public interest. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784

F.3d 887, 895 (2d Cir. 2015) (internal quotations omitted). In general, where a complaint alleges the denial of a constitutional right, irreparable harm will be presumed. *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (*citing* 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2948).

Plaintiffs easily satisfy these factors here. Indeed, Defendants' policy of pathologizing skin color and ancestry has injured and will continue to injure Plaintiff Stewart and Plaintiff FAIR's members by intentionally and unconstitutionally discriminating against them on the basis of their race and ethnicity – classifications that the Supreme Court, in *Shaw v. Reno*, 509 U.S. 630, 643 (1993), denounced as "odious to a free people whose institutions are founded upon the doctrine of equality."

A. <u>Standing</u>

Standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *Kiryas Joel All. v. Vill. of Kiryas Joel*, 495 Fed. Appx. 183, 188 (2d Cir. 2012). Where, as here, a case involves "multiple plaintiffs, only one plaintiff need possess the requisite standing for a suit to go forward." *New York v. U.S. Dep't of Agric.*, 454 F. Supp. 3d 297, 303 (S.D.N.Y. 2020) (citing *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017)). Nevertheless, both plaintiffs in this action – one a membership-based organization and the other an individual – have standing.

1. <u>Plaintiff Benjamin Stewart</u>

To demonstrate Article III standing, an individual plaintiff must show that: (1) he is suffering an "injury in fact" that is "distinct and palpable"; (2) his injury is "fairly traceable to the challenged action"; and (3) his injury is "redressable by a favorable decision." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Here, Plaintiff Stewart is suffering injury-in-fact from New York State and New York City's discriminatory policies because he and other non-Hispanic/Latino white individuals cannot obtain oral antiviral treatments in New York when they contract COVID-19 unless they demonstrate a "medical condition or other factors that increase their risk for severe illness" from the virus, while non-white and Hispanic/Latino residents of New York are not required to make such a showing (Exh. 1 at ¶¶ 29-33; Exh. 6 (Declaration of Benjamin Stewart)). This discriminatory treatment inflicts injury-in-fact, regardless of whether Plaintiff Stewart would ultimately obtain the antiviral treatments in the absence of the racially and ethnically discriminatory state and municipal policies. The Supreme Court made this point crystal clear in *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*:

> "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."

508 U.S. 656, 666 (1993); *accord Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*, 364 F. Supp. 3d 253, 273 (S.D.N.Y. 2019).[4]

Additionally, an increased risk of future physical injury confers standing in an action challenging a government policy. *See*, *e.g.*, *Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000); *Baur v. Veneman*, 352 F.3d 625 (2nd Cir. 2003). As the Fourth Circuit stated in *Friends of the Earth*:

> "By producing evidence that Gaston Copper is polluting Shealy's nearby water source, CLEAN has shown an increased risk to its

---

[4] Even outside of the equal protection realm, Plaintiff Stewart would still have standing because the relevant injury for standing purposes is "exposure to a sufficiently serious risk of medical harm - not the anticipated medical harm itself." *Baur v. Veneman*, 352 F.3d 625, 641 (2d Cir. 2003).

> member's downstream uses. This threatened injury is sufficient to provide injury in fact. Shealy need not wait until his lake becomes barren and sterile or assumes an unpleasant odor and smell before he can invoke the protections of the Clean Water Act. Such a novel demand would eliminate the claims of those who are directly threatened but not yet engulfed by an unlawful discharge. Article III does not bar such concrete disputes from court."

*Friends of the Earth, Inc. v. Gaston Copper Recycl. Corp.*, 204 F.3d 149, 160 (4th Cir. 2000).

Because the OAV and mAb treatments are so effective, New York State's and New York City's discriminatory policies substantially increase the risk of hospitalization and death for Plaintiff Stewart, who is guaranteed to be at the end of the line. Furthermore, the treatments must be administered very quickly, within five to ten days of symptom onset, making post-infection injunctive relief virtually impossible. Plaintiff Stewart (and FAIR's members) should not need to wait to become gravely ill or die before they (or their estates) can effectively challenge the State and City's facially discriminatory policies.

  2. Plaintiff FAIR

A membership organization like FAIR has both associational and direct standing to bring this action and to seek declaratory and injunctive relief. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiff FAIR's individual members have standing in their own right for the same reasons Plaintiff Stewart does. For example, FAIR member Illana Leiser avers that if she contracts COVID-19, she would want to receive treatment with oral antivirals or monoclonal antibodies. However, because Ms. Leiser is younger than 65 years of age, is classified as a non-

Hispanic white, is not fully vaccinated and has no risk factors for severe COVID-19 illness, she does not qualify for any of the Tier 1 risk groups (Exh. 7 (Declaration of Illana Leiser); Exh. 2). Were Ms. Leiser non-white or of Hispanic extraction though, she would be placed in Tier 1 risk group 1C and receive much higher priority for COVID treatment simply because of her skin color or ancestry.

The same is true for FAIR member Kevin Ray, who is younger than 65 and who identifies as a non-Hispanic white (Exh. 8 (Declaration of Kevin Ray)).  Mr. Ray, who has been fully vaccinated, does not have any medical risk factors that are known to lead to severe COVID-19 disease.  Nevertheless, he works in a setting where there is a high risk of exposure to COVID-19 and attests that he would seek oral antiviral or monoclonal therapy treatment if he develops symptoms, tests positive for SARS-CoV-2, and is within 5-10 days of symptom onset.  However, given his profile, Mr. Ray falls into none of the Tier 1 risk groups. If he were of a non-white race or of Hispanic heritage, however, he would qualify for Tier 1 risk Group 1E and would receive higher priority for COVID treatments for no other reason than his race or ethnicity.

Next, the interests FAIR seeks to protect are unquestionably germane to its mission to promote equal protection under the law and to advocate for individuals who suffer discrimination based on their skin color, ancestry, or other immutable characteristics.  Finally, because the complaint seeks a declaratory and injunctive relief, not compensatory damages, the participation of individual members in the lawsuit is not required. *Rural & Migrant Ministry v. United States EPA*, 510 F. Supp. 3d 138, 155 (S.D.N.Y. 2020); *Brooklyn Ctr. for Independence of the Disabled v. Bloomberg*, 290 F.R.D. 409, 416 (S.D.N.Y. 2012).

With respect to Plaintiff FAIR's Section 1983 claim, the Second Circuit has held that an organization can only sue on its own behalf under Section 1983, not on behalf of its members.

*Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011).[5]  To establish direct standing, an organization must "meet[ ] the same test that applies to individuals." *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)).  An organization may establish injury-in-fact by showing that the challenged conduct causes a "perceptible impairment" of the organization's activities. *Nnebe*, 644 F.3d at 157.  A "perceptible impairment" exists where the organization diverts resources from its other activities as a result of the challenged conduct.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (a "drain on the organization's resources" establishes injury-in-fact sufficient for Article III standing).

Under this standard, FAIR has direct standing to bring its Section 1983 claim. FAIR has expended, and continues to expend, resources outside of this litigation researching the NYS and NYC Orders, purchasing ads to inform the public about the Orders and to urge them to make their voices heard, organizing public events to educate the public about them, engaging in grassroots advocacy to encourage members of the public to protest them, speaking with the press about them, lodging complaints with health care providers about their adherence to the policies and lobbying state and municipal officials to have the policies withdrawn. And, of course, FAIR continues to engage in these efforts and to outlay its money, time and resources and will do so until the NYS and NYC Orders are no longer enforced.  Moreover, in addition to its political and grassroots advocacy, FAIR has expended and will continue to expend time, money and resources to this litigation, seeking to overturn the policy through legal challenges.

---

[5]  FAIR maintains that *Nnebe* is wrongly decided insofar as it contradicts the Supreme Court's earlier holdings in *Warth v. Seldin*, 422 U.S. 490 (1975) and *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977).  In *Warth*, the Supreme Court held that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members" in a Section 1983 action.  *Warth*, 422 U.S. at 511.  In *Hunt*, the Supreme Court, citing *Warth*, held that an organization can sue on behalf of its members. *Hunt*, 432 U.S. at 343.  FAIR submits that the Supreme Court's formulation in *Warth* and *Hunt* is correct and binding here.  Nevertheless, even under the approach followed by the Second Circuit – to which FAIR objects – FAIR has established Article III standing.

These ongoing expenditures of organizational time, money and resources represent an opportunity cost to FAIR and a perceptible impairment to the organization's ability to provide services to further its mission.  This constitutes a cognizable injury-in-fact that is directly traceable to the conduct being challenged in this lawsuit. Such injuries are redressable by a favorable decision in this action since the discriminatory provisions of the NYS and NYC Orders were in effect at the time the action was initiated, are ongoing, and will continue into the future if undeterred. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185-86 (2000) ("It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress."). Accordingly, in addition to associational standing, Plaintiff FAIR also has direct standing for all of its claims.[6] *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993); *see also New York State Citizens' Coalition for Children v. Velez*, 629 Fed. Appx. 92, 94 (2d Cir. 2015).

B. <u>Likelihood of Success</u>

Section 1983 creates "a species of tort liability" for, among other things, certain violations of constitutional rights. *Heck v. Humphrey*, 512 U.S. 477, 483 (1994).  Section 1983 prohibits conduct which, "under color of [state law] . . . subjects [a person], or causes [a person]

---

[6]   While *Nnebe* applies to associational standing in Section 1983 actions – and possibly claims brought against state actors under Section 1981, *see*, *e.g.*, *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989) (Section 1983 provides the "exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units") – it does not apply to FAIR's claims under Title VI, the Affordable Care Act, and the New York State Constitution. As to those claims, the ordinary principles of associational standing still govern.  *See Peters v. Jenney*, 327 F.3d 307, 315 (4th Cir. 2003) ("It is well settled that there is an implied private right of action to enforce [Title VI's] core prohibition of discrimination in federally-financed programs"); *see also* 42 U.S.C. § 18116(a) ("The enforcement mechanisms provided for and available under such title VI... shall apply for purposes of violations of this subsection" based on race, color, or national origin). Moreover, FAIR maintains that ordinary associational standing rules, not the direct standing requirement of *Nnebe*, apply to claims brought against state actors under Section 1981. FAIR submits that legislative enactment of Section 1981(c) statutorily overruled *Jett* and created an implied private right of action against state actors under Section 1981. FAIR nevertheless recognizes that the circuits are split on this issue.

to be subjected . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983.  Under *Monell v. Dep't of Soc. Servs*, 436 U.S. 658, 694 (1978), local governments and their agencies can be sued as "persons" under Section 1983 and held liable where a government policy causes a constitutional deprivation. *See also Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012).  Official municipal policy "includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Here, Plaintiffs are likely to succeed on their Section 1983 claim that the NYS and NYC Orders violate the Fourteenth Amendment of the U.S. Constitution[7], as well as on their claim that the Orders violate the equal protection clause of the New York State Constitution.[8]  *See Dorsey v. Stuyvesant Town Corp.,* 299 N.Y. 512, 530 (1949) (The Equal Protection Clause of the New York State Constitution "is no more broad in coverage than its Federal prototype"). The Fourteenth Amendment's Equal Protection Clause declares that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1.  The Supreme Court has explained that "[t]he central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race," *Washington v. Davis*, 426 U.S. 229, 239 (1976), and "any official action that treats a person

---

[7]  With respect to Plaintiffs' Section 1983 claim against Defendant Bassett, the 11th Amendment does not bar suits against state officials in their official capacities where, as here, the suit seeks prospective injunctive or declaratory relief for violations of federal law. *Ex parte Young*, 209 U.S. 123, 159-60 (1908).

[8]  The Equal Protection Clause of the New York State Constitution provides that "No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state." N.Y. Const., art I, § 11.

differently on account of his race or ethnic origin is inherently suspect." *Fisher v. Univ. of Tex.*, 570 U.S. 297, 311 (2013).

"A statute or policy utilizes a 'racial classification' when, on its face, it explicitly distinguishes between people on the basis of some protected category." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999).   It is well established that "when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007); *accord Adarand Constructors v. Pena*, 515 U.S. 200, 227 (1995) ("[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny.").   The same is true for classifications based on national origin. *Rice v. Cayetano*, 528 U.S. 495, 517 (2000) ("Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people."); *see generally Korematsu v. United States*, 323 U.S. 214, 216 (1944). "When the government expressly classifies persons on the bases of race or national origin ... its action is immediately suspect  .... A plaintiff in such a lawsuit need not make an extrinsic showing of discriminatory animus or a discriminatory effect to trigger strict scrutiny." *Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 204-05 (2d Cir. 2006).

Under strict scrutiny, suspect classifications "are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Adarand*, 515 U.S. at 227. This rigorous standard applies even when the government employs such classifications for "benign" reasons, such as for "race-targeted medical outreach programs." *Bush v. Vera*, 517 U.S. 952, 984 (1996); *see also University of Calif. Regents v. Bakke*, 438 U.S. 265, 310 (1978) (rejecting racial classifications implemented to "improv[e] the delivery of health-care services to communities currently underserved") (Powell, J., plurality); *Mitchell v. Washington*, 818 F.3d

436, 444 (9th Cir. 2016) ("[S]trict scrutiny should be applied in the medical context .... because even medical and scientific decisions are not immune from invidious and illegitimate race-based motivations and purposes."). Ultimately, it is the government that bears the burden to prove "that the reasons for any [racial or ethnic] classification [are] clearly identified and unquestionably legitimate." *Richmond v. J. A. Croson Co.*, 488 U.S. 469, 505 (1989).

At the outset, a "racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Shaw*, 509 U.S. at 643-44 (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 272 (1979)). In fact, the Supreme Court has recognized only two interests compelling enough to justify racial classifications. The first is remedying the effects of past de jure segregation or discrimination in the specific industry and locality at issue in which the government played a role, and the second is "diversity in higher education." *Parents Involved in Cmty. Sch.*, 551 U.S. at 720-22. The governmental interests underlying the NYS and NYC Orders fall into neither of these categories.

Defendants cannot demonstrate that the NYS and NYC Orders' race and ethnic preference system serves any legitimate governmental purpose, let alone an extraordinary one. Indeed, the Supreme Court presciently observed that classifications based on immutable characteristics like skin color and national origin "are so seldom relevant to the achievement of any legitimate state interest" that government policies "grounded in such considerations are deemed to reflect prejudice and antipathy – a view that those in the burdened class are not as worthy or deserving as others." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

As shown by Dr. Mendoza declaration, a patient's race and ethnicity do not, by themselves, put that patient at a higher risk of severe illness or death from COVID-19 (Exh. 5 at ¶ 16). Although some medical conditions may, in some cases, correlate with race or ethnicity –

such as Sickle Cell Disease or Tay-Sachs Disease – "there is no known medical basis for concluding that a specific skin color, race, or ethnicity itself places a patient at a higher risk of serious severe illness or death from COVID-19." *Id.* Further, while certain racial and ethnic groups may, when considered as a *group*, have a higher or lower incidence of some of the known COVID-19 comorbidities, the standard of care in Emergency Medicine requires physicians to examine each patient *individually* in a clinical setting and to take a detailed history from them. *Id.* at ¶ 17. This process allows the physician to identify any relevant comorbidities and to take them into account in arriving at an appropriate treatment plan for that patient. *Id.* Thus, explains Dr. Mendoza, there is "no justifiable medical need for automatically assigning risk factors based on a patient's race and/or ancestry." *Id.*[9]

In fact, the defendants effectively admit prioritization is given not because "non-white" or "Hispanic/Latino" persons have an established biological or genetic propensity for severe COVID-19, but because of vague "longstanding systemic" inequities. No controlling authority, however, permits racial classifications in medical treatment to be based on generalized and vague "inequities." To the contrary, the Supreme Court has rejected such justifications for race-based classifications. *J.A. Croson*, 488 U.S. at 492, 498-500 ("[A] generalized assertion that there has been past discrimination in an entire industry ... has no "logical stopping point" .... [A]n amorphous claim that there has been past discrimination in a particular industry cannot justify the use of an unyielding racial quota."); *accord Wygant v. Jackson Board of Educ.*, 476 U.S. 267, 276 (1986) ("Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy."); *Bakke*, 438 U.S. at 307-9 ("remedying of the effects of 'societal

---

[9]     Since medical providers can identify relevant comorbidities by conducting a clinical examination and taking a detailed medical history of each patient, the requirements to mechanically assign risk factors because of skin color and ethnicity are overbroad and therefore fail strict scrutiny on that basis as well. *See Grutter v. Bollinger*, 539 U.S. 306, 334 (2003) (to be to be narrowly tailored, a race-conscious program must be based on "individualized consideration," and race must be used in a "nonmechanical way").

discrimination'" does not pass strict scrutiny) (Powell, J., plurality); *Associated Gen. Contractors v. New Haven*, 41 F.3d 62, 66 (2d Cir. 1994) ("In order to meet this standard [of strict scrutiny], the City of New Haven must show that discriminatory practices have affected the local construction industry."). As such, the openly discriminatory NYS and NYC Orders lack any compelling government interest and cannot survive strict scrutiny.

The recent decision in *Vitolo v. Guzman,* 999 F.3d 353, 357 (6th Cir. 2021), is instructive, if not dispositive, for it invalidated a racial prioritization scheme very similar to the one at issue here. In early 2021, Congress enacted a law granting federal financial aid to certain restaurant owners, prioritizing non-white applicants on the ground that they are socially disadvantaged because of past societal discrimination. A white restaurant owner filed suit and sought a temporary restraining order and preliminary injunction. The district court denied the relief and the plaintiff appealed. The Sixth Circuit reversed, finding the plaintiff was likely to prevail on his claim that the government's racial prioritization violated the Equal Protection guarantee. The *Vitolo* Court held that the government's reliance on general societal discrimination and data showing statistical disparities between non-white- and white-owned businesses was insufficient to justify the racial prioritization. *Id*. at 361-62. It correctly noted that "when it comes to general racial disparities, there are simply too many variables to support inferences of intentional discrimination," as required to pass strict scrutiny. *Id*. at 362; *see Wygant*, 476 U.S. at 276 (statistical disparities alone cannot justify differential treatment based on race because there are typically "numerous explanations" for the disparities that can be "completely unrelated to discrimination of any kind"). Plaintiffs' request for emergency relief is even more warranted here than in *Vitolo*: while *Vitolo* involved the denial of economic relief, the NYS and NYC Orders involve the denial of life-saving medical treatment.

The NYS and NYC Orders also fail strict scrutiny because Defendants' racial classifications are not narrowly tailored. Presumably, persons of Asian descent would be deemed "non-white" and would therefore receive priority for life-saving COVID-19 treatments. However, Defendants' own data shows that Asian Americans have better outcomes from COVID-19 than any other racial group for which data is available. Data from the New York State DOH demonstrates that while persons of Asian descent constitute 14% of New York City's population, they represent only 7% of COVID-19 deaths (Exh. 9). Similarly, the New York City DOHMH data shows that Asian Americans have the lowest rate of hospitalization and death among all racial groups in New York City, significantly below their share of the population (Exhs. 10-11). This pattern is true nationwide: according to CDC data, Asian Americans are disproportionately under-represented in COVID-19 hospitalization and death rates – more so than any other racial group, including white Americans (Exh. 12). This "gross overinclusiveness" of Defendants' racial preferences "strongly impugns [their] claim of remedial motivation." *J.A. Croson*, 488 U.S. at 506. Rather than being legitimate, the NYS and NYC Orders appear to be "a form of racial politics." *J.A. Croson*, 488 U.S. at 511.

The Orders fail to pass strict scrutiny for yet another reason: the burden they place upon innocent persons is too heavy. In *Wygant*, the Supreme Court found that racial classifications that would have caused innocent persons to lose their jobs were "too intrusive" and therefore not narrowly tailored for purposes of strict scrutiny. *Wygant*, 476 U.S at 283-84. Here, Defendants' racially discriminatory prioritization for COVID-19 treatments could cause innocent persons classified as white to lose their lives. If loss of a job is too great of a burden to pass strict scrutiny, loss of health or life most certainly is.

Moreover, the purported government interest in remedying historic inequities is undercut by the fact that such race- and ethnicity-based medical rationing also promotes an evil canard,

rooted in eugenics, that non-white races and ethnicities are more sickly, weak, and infectious simply because of their skin color and ancestry.  Defendants' policy likens darker complexion to a disease or other negative condition.  *See J.A. Croson*, 488 U.S. at 493 ("Classifications based on race carry a danger of stigmatic harm. Unless they are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility.").

Because the blatant racial and ethnic classifications here are presumptively invalid, and since Defendants cannot show any extraordinary government justification for engaging in such invidious discrimination, Plaintiffs also are likely to succeed on their federal statutory claims under 42 U.S.C. § 1981[10], Title VI, and the Affordable Care Act – all of which prohibit discrimination on the basis of race and national origin.[11]

C.  Irreparable Harm

The NYS and NYC Orders pose immediate and actual irreparable injury to Plaintiffs.  In general, where a complaint alleges the denial of a constitutional right, irreparable harm will be presumed.  *Mitchell*, 748 F.2d at 806 ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary").  That is certainly the case here, where the NYS and NYC Orders – whose discriminatory terms fail strict scrutiny – deprive Plaintiff Stewart and Plaintiff FAIR's white members of their constitutional right to equal protection.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (the deprivation of constitutional rights "for even minimal periods of time, unquestionably constitutes irreparable harm").

---

[10]    The Supreme Court, in *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976), made clear that Section 1981 prohibits racial discrimination against white persons as well as non-white persons.

[11]    The statutory claim under Title VI arises out of 42 U.S.C. § 2000d, and the claim under the Affordable Care Act arises out of 42 U.S.C. § 18116.

Further, as its name suggests, an irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate. *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 73 (2d Cir 1979). A substantial risk of serious illness or death has often been found to constitute irreparable harm. *See*, *e.g.*, *Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 43-44 (2d Cir. 1997) (finding irreparable harm where the closure of a treatment program would pose serious risk of harm to plaintiffs, including "death, illness or disability"); *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332-33 (2d Cir. 1995) (upholding District Court's irreparable harm finding based on the "risk of injury, infection, and humiliation"); *see also New York. v. Heckler*, 742 F.2d 729, 736 (2d Cir. 1984) (harm is irreparable if many members of the class would likely suffer "a severe medical setback" as a result of the challenged requirement), *aff'd sub nom. Bowen v. City of New York*, 476 U.S. 467 (1986); *New York v. Sullivan*, 906 F.2d 910, 918 (S.D.N.Y. 1990) (a claim of irreparable harm exists where a challenged requirement "potentially subject[s] claimants to deteriorating health, and possibly even to death").

Given the highly transmissible nature of the Omicron variant, the harms sought to be prevented by this motion are hardly remote or speculative – they are sufficiently real and immediate. If the racial and ethnic preference system included in the NYS and NYC Orders are not enjoined, Plaintiff Stewart and Plaintiff FAIR's members who are classified as non-Hispanic white face an imminent and substantial likelihood that they will be denied access to lifesaving therapeutics. The severe health consequences or death that could result from COVID-19 infection without these therapies are injuries that cannot adequately be recompensed with monetary damages after the fact.  These consequences have been held to constitute irreparable harm.  *Basank v. Decker*, 449 F. Supp. 3d 205, 213 (S.D.N.Y. 2020) ("The risk that Petitioners will face a severe, and quite possibly fatal, infection if they remain in immigration detention constitutes irreparable harm warranting a TRO"); *Mays v. Dart*, 453 F. Supp. 3d 1074, 1098

(N.D. Ill. 2020) (The risk of "severe health consequences, including death, if they contract coronavirus disease" constituted "irreparable harm").

     D.  <u>Balance of Harms and Public Interest</u>

Where, as here, the government is the opposing party, the final two factors in the temporary restraining order analysis – the balance of the harms and the public interest – merge. *Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018).  As to the balance of harms, the likelihood of real and immediate irreparable harm to Plaintiff and its members from the failure to grant them interim relief clearly outweighs the likelihood of any harm to Defendants from granting such relief. After all, "securing [Constitutional] rights is in the public interest." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *Coronel v. Decker*, 449 F. Supp. 3d 274, 287 (S.D.N.Y. 2020) ("[T]he public interest is best served by ensuring the constitutional rights of persons within the United States are upheld") (citation omitted).

Indeed, Defendants cannot show that enjoining this policy will adversely impact them at all. First, "the Government does not have an interest in the enforcement of an unconstitutional law." *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003).  This is especially true of a governmental policy that discriminates on the basis of skin color and national origin, since "every time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all." <u>Fisher</u>, 570 U.S. at 316 (2013) (Thomas, J., concurring). Next, the injunction sought by Plaintiffs will still allow Defendants to continue to allocate scarce treatments according to the State Prioritization memo with the exception of race and ethnicity. Accordingly, the balance of harms and the public interest weigh in favor of granting Plaintiffs' motion for a temporary restraining order and preliminary injunction.

<u>CONCLUSION</u>

For the foregoing reasons, this Court should grant Plaintiffs' motion to preliminarily enjoin the enforcement of the NYS and NYC Orders insofar as they direct that "non-white race or Hispanic/Latino ethnicity" be considered a "risk factor" in determining an individual's risk for severe COVID-19 illness. A temporary restraining order is requested pending a final determination on the preliminary injunction motion to prevent irreparable harm to Plaintiff Stewart, Plaintiff FAIR and Plaintiff FAIR's members while these issues are under consideration.


Dated:          New York, New York
                February 23, 2022

                                    Respectfully submitted,

                                      /S/ Ameer Benno
                                    Ameer Benno
                                    BENNO & ASSOCIATES P.C.
                                    30 Wall Street, 8th Floor
                                    New York, NY 10005
                                    Tel.: (212) 227-9300
                                    Email: abenno@bennolaw.com

                                    *Attorneys for Plaintiffs*