

March 21, 2022

**VIA ECF**
The Honorable Katherine Polk Failla
United States District Court, SDNY
40 Foley Square
New York, NY 10007

Re:     *FAIR, et al. v. City of New York, et al.*, 22-CV-528 (KPF) (JW)

Your Honor:

Last week, Defendants filed a letter notifying this Court of a decision from the Eastern District of New York in *Roberts v. Bassett*, 22-CV-710 (NGG) (RML). In that decision, Judge Garaufis determined that the plaintiffs in that action lacked Article III standing. Plaintiffs FAIR and Stewart respectfully submit that the *Roberts* decision was incorrectly decided, has no application here and should not be followed.

### Legal Standard for Article III Standing

The test for constitutional standing requires a plaintiff to show: (1) an injury-in-fact; (2) a fairly traceable causal connection between the actions of the defendant and the injury-in-fact; and (3) a likelihood that a favorable decision will redress the plaintiff's complained-of injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

In the Second Circuit, a plaintiff asserting an Equal Protection claim can establish injury-in-fact by demonstrating that: (1) there exists a reasonable likelihood that the plaintiff is in a disadvantaged group; (2) there exists a government-erected barrier; and (3) the barrier causes members of one group to be treated differently from members of the other group. *Comer v. Cisneros*, 37 F.3d 775, 793 (2d Cir. 1994).

### Organizational and Individual Standing

At the outset, while *Roberts* addresses the standing of the two individual plaintiffs in that case, it did not consider the issue of direct standing by an organization like FAIR. *Roberts v. Bassett*, 2022 U.S. Dist. LEXIS 45775 (E.D.N.Y. Mar. 15, 2022). The Second Circuit has been clear that an organization may establish injury-in-fact by showing that the challenged conduct causes a "perceptible impairment" in its activities, *Nnebe v. Daus*, 644 F.3d 147, 156-57 (2d Cir. 2011), such as when the organization diverts resources from its other activities as a result of the challenged conduct. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The unrebutted allegations in this case establish that Plaintiff FAIR has suffered such an impairment as a result of the challenged state and municipal policies. And, in cases involving "multiple plaintiffs, only one plaintiff need possess the requisite standing for a suit to go forward." *New York v. U.S. Dep't of Agric.*, 454 F. Supp. 3d 297, 303 (S.D.N.Y. 2020).

Nevertheless, both Plaintiffs here have standing (including associational standing by Plaintiff FAIR on behalf of its members) to challenge the unconstitutional state and municipal policies at issue in this case, and nothing in *Roberts* compels the opposite conclusion.

### **Existence of a Barrier**

Under the challenged state and municipal policies, individuals classified as non-Hispanic and white who test positive for COVID-19 are ineligible for monoclonal antibody or oral antiviral treatments unless they also demonstrate "a medical condition or other factors that increase their risk for severe illness." Meanwhile, similarly situated "non-white" or "Hispanic/Latino" individuals are automatically eligible for these life-saving antiviral treatments without having to make such a showing and regardless of the individual's medical situation. Thus, the policies erect a barrier preventing equal treatment.

The court in *Roberts*, however, concluded that the challenged policies were not barriers denying equal treatment because they "d[id] not set aside a predetermined number of pills for nonwhite and Hispanic New Yorkers" or "set a threshold ... number of points in order to obtain the Treatments or give some predetermined percentage of such points to nonwhite and Hispanic patients." *Roberts*, 2022 U.S. Dist. LEXIS 45775, at \*13-14. This view is far too narrow. Any government policy that that makes it more difficult for members of one group to obtain a benefit than it is for members of another group establishes a barrier. *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656, 666 (1993); *Comer*, 37 F.3d at 793. While set-asides of the sort identified in *Roberts* might be sufficient to establish a barrier, they are not necessary.

In any event, this case *does* involve a race- and ethnicity-based set-aside: the government is setting aside a "risk factor" for non-whites and Hispanics only. That risk factor – which greatly enhances a patient's chances at obtaining lifesaving therapies when those medications are in short supply – is completely unavailable to individuals who fall into neither of those categories. Thus, the challenged policies here are no different than the race-based set-aside of points that the Supreme Court deemed to be a barrier in *Gratz v. Bollinger*, 539 U.S. 244 (2003). Simply put, white and non-white patients are not on equal footing under the NYS and NYC Orders.

*Roberts* next held that the challenged policies do not present a barrier denying equal treatment because they are merely "nonbinding guidance." *Roberts*, 2022 U.S. Dist. LEXIS 45775, at \*14, 17, 22, 24-26, 28.  That was incorrect. The NYS Order directs that all New York State health care providers and health care facilities must consider "non-white race or Hispanic/Latino ethnicity" a "risk factor" in determining eligibility for COVID-19 oral antiviral treatments, and it commands them to "adhere to" the framework and the race- and ethnicity-based prioritization protocol set out in the State Prioritization Memo. The NYC Order also mandates that all medical providers in the City of New York "adhere to New York State Department of Health guidance on prioritization of high risk patients for anti-SARS-CoV-2 therapies during this time of severe resource limitations." Far from "nonbinding guidance," the plain language of the orders establishes that they are compulsory directives.

Further, in support of their application for a TRO, plaintiffs FAIR and Stewart have submitted a declaration from Carrie Mendoza, M.D., an expert Emergency Medicine physician who has treated thousands of COVID-19 patients. In it, Dr. Mendoza affirmed that "[i]t is common, standard, and expected practice for physicians to follow medical and health guidelines and advisories that impact their medical field and that are issued by the health department in the state and city in which they practice," and thus that medical providers "would be compelled to follow the Advisory, Announcement and Framework and prioritize their COVID-19 patients for oral antivirals and monoclonal antibodies based on race and ethnicity." Dr. Mendoza's declaration is unrebutted by the state and municipal defendants.

Finally, as a matter of public policy, any ambiguity in the NYS and NYC Orders must be construed against Defendants since they drafted those documents. *See* Restatement (Second) of Contracts § 206 (1981) ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.").[1]

### **Impact of the Barrier on Different Groups**

The court in *Roberts* next stated that even if a barrier exists, a plaintiff "is not injured by [its] mere existence" but must show that he has suffered a concrete, identifiable harm as a result of it. *Roberts*, 2022 U.S. Dist. LEXIS 45775, at *15-18, 20. Applying this standard, the *Roberts* Court found that the plaintiffs lacked standing because they "never contracted COVID-19 nor sought out the Treatments during the period of shortage" and because they were not prevented from obtaining the treatments on the basis of their race. *Id*. at *17. Yet, under controlling case law, none of that was required to demonstrate standing.

In *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656 (1993), the Supreme Court held that "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit," causes "injury in fact." *Id*. at 666. Further, in *Gratz v. Bollinger*, 539 U.S. 244 (2003), the Supreme Court explicitly rejected the position taken by the district court in *Roberts*. The *Gratz* Court stated:

> "Justice Stevens argues that petitioners lack Article III standing to seek injunctive relief with respect to the University's use of race in undergraduate admissions. He first contends that because Hamacher did not actually apply for admission as a transfer student, his claim of future injury is at best conjectural or hypothetical rather than real and immediate. But whether Hamacher actually applied for admission as a transfer student *is*

---

[1] Because the state and municipal policies are mandatory in nature, there is a causal connection between the injury and the conduct complained of. *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (traceability exists if the defendant's actions had a "determinative or coercive effect upon the action of someone else" who directly caused the alleged injury).

3

> *not determinative of his ability to seek injunctive relief in this case.*"

*Id.* at 260 (cleaned up) (emphasis added). What mattered for purposes of standing, said the Court in *Gratz*, was simply whether the plaintiff *intended* to apply to the university with the discriminatory admissions policy, even if he had not done so yet. *Id.* at 261. The *Gratz* majority explained that where a race-based policy is alleged to be a barrier to equal treatment, an individual plaintiff establishes his or her standing by simply demonstrating that he or she is "able and ready" to participate in the activity where the barrier exists[.]" *Id.* at 262.

That is the circumstance here. Plaintiff Stewart and other FAIR members have averred unequivocally in their declarations (and in their verified pleadings) that "[i]f [they] were to test positive for SARS-CoV-2, have or develop symptoms, and be within 5-10 days of symptom onset, [they] would seek treatment with oral antivirals or monoclonal antibodies." This suffices to confer standing on them to challenge the NYS and NYC Orders.

The *Roberts* Court's unduly rigorous standing criteria also flies in the face of *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007). There, the Supreme Court held that "being forced to compete in a race-based system that *may* prejudice the plaintiff" constitutes an injury under the Equal Protection Clause for purposes of standing. *Id.* at 719 (emphasis added). In that case, the defendant argued that plaintiffs whose children were in elementary and middle school lacked standing to argue that a race-based school district policy would deny their children "admission to the high schools of their choice when they apply for those schools in the future." *Id.* at 718. The Supreme Court found this argument "unavailing," however, stating, "The fact that it is possible that [these children] will not be denied admission to a school based on their race ... does not eliminate the injury claimed" or their parents' standing to challenge the policy. *Id.* at 718-19

The type of injuries that the *Roberts* Court required plaintiffs to show in order to establish their standing also contravenes controlling authority in the Second Circuit, which holds that "*exposure* to a sufficiently serious *risk* of medical harm - not the anticipated medical harm itself" is the relevant injury for standing purposes. *Baur v. Veneman*, 352 F.3d 625, 641 (2d Cir. 2003) (emphasis added). That decision applies with force here, yet the court in *Roberts* ignored it completely.

### **Imminent Effects of Harm**

The *Roberts* Court also held that plaintiffs must suffer the effects of a discriminatory barrier "imminently" in order to have standing to challenge it.[2] It then concluded that any

---

[2] The *Roberts* Court's reliance on *MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d 40 (2d Cir. 2017) for the premise that "even in barrier cases, courts must still inquire into whether the injury is 'imminent' or 'certainly impending'" is misplaced. In that decision, the Second Circuit determined that the plaintiff did not have a viable barrier claim. Id. at 46.

harmful effects to the plaintiffs from the NYS and NYC Orders could not be imminent because those policies are no longer in effect. *Id*. at *20. This, too, was error.

Preliminarily, Judge Garaufis's assertions that the NYS Order is "not in effect" and that the NYC Order was "superseded" were factually inaccurate. *Id*. at *21. Nothing contained in the City of New York's 2022 Health Advisory #2 states that the 2021 Health Advisory #39 has been superseded or withdrawn.[3] Nor has the NYS Order been suspended or replaced. At the Mar. 2, 2022 TRO hearing, counsel for Defendant Bassett conceded on the record that the New York State DOH "ha[s] not withdrawn" the policy (Tr. at 11-12). Counsel also added that the DOH is "not in the habit of rescinding guidance so long as the guidance is accurate, and th[is] guidance is accurate" (Tr. at 12).

Further, on Mar. 7, 2022, counsel for Defendant Bassett in *Roberts* filed a letter in that case stating that although the New York State DOH issued additional guidance regarding COVID-19 treatment options on Mar. 4, 2022, that guidance "d[id] not supersede the December 2021 Guidance" (ECF No. 31).[4] That letter further expressed that "although the Therapies are now widely available and there are no current shortages in supply ... the December 2021 Guidance recommends the prioritization of patients based on their level of risk of progressing to severe COVID-19 during times of resource limitations." This letter confirms that the New York State DOH intends to rely on the December 2021 Guidance when supplies are low.

Next, the mere existence of a barrier denying equal treatment creates an actual, immediate and legally cognizable injury sufficient to confer standing, and the plaintiffs in such a case do not have to demonstrate that they will suffer the effects of the discriminatory policy "imminently" in order to have standing to challenge it.[5] *See Jacksonville*, 508 U.S. at 666; *Parents Involved*, 551 U.S. at 719 ("[O]ne form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff."); *Parents Involved*, 551 U.S. at 718-19 ("The fact that it is possible that [elementary and middle school children] will not be denied admission to a [high] school based on their race ... does not eliminate the injury claimed" or their parents' standing to challenge the race-based policy); *Gratz*, 539 U.S. at 260 (rejecting the argument that a student lacked standing to challenge a race-based

---

[3] Moreover, 2022 Health Advisory #2 applies to Paxlovid only, whereas 2021 Health Advisory #39 addresses Paxlovid, Molupiravir, and Sotrovimab. Additionally, Health Advisory #2 explicitly states that supplies of therapeutics "remain limited."

[4] In any case, even if the policies being challenged here had been suspended or superseded, that is irrelevant for purposes of standing, since both policies were in effect at the time the lawsuit was filed. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed.").

[5] The *Roberts* Court's reliance on *MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d 40 (2d Cir. 2017) for the premise that "even in barrier cases, courts must still inquire into whether the injury is 'imminent' or 'certainly impending'" is misplaced. In that decision, the Second Circuit determined that the plaintiff did not have a viable barrier claim. Id. at 46.

college admissions policy because he "did not actually apply for admission" and because "his claim of future injury is at best conjectural or hypothetical rather than real and immediate").

Finally, the Second Circuit has explained that "the probability of harm which a plaintiff must demonstrate in order to allege a cognizable injury-in-fact logically varies with the severity of the probable harm," and that "the more drastic the injury that government action makes more likely, the lesser the increment in probability necessary to establish standing." *Baur*, 352 F.3d at 637 (citation omitted). Where, as here, the harm includes a risk of death, "even a moderate increase in the risk of [harm] may be sufficient to confer standing." *Id.* And, if the "risk of harm arises from an established government policy," such circumstance is a "critical factor[ ] that weigh[s] in favor of concluding that standing exists." *Id*. That is the situation here, but the district court in *Roberts* did not consider this line of cases at all in its standing analysis.

**Redressability**

The court in *Roberts* concluded its standing analysis by asserting that a favorable decision would not have redressed the plaintiffs' injuries. Specifically, the court stated that because "[t]he EUAs for the Treatments are limited to individuals with a high risk of developing severe COVID-19, as defined by the CDC's risk factors," plaintiff Roberts, who has none of those risk factors, "faces a complete barrier to obtaining the Treatments" whether or not the policies are in place.

This analysis missed the mark. To be sure, the Emergency Use Authorizations for the oral antivirals and monoclonal antibody treatments delineate that those therapies are authorized for those 12 years of age and older who test positive for SARS-CoV-2 and are at high risk for progression to severe COVID-19.[6] But a person's current lack of medical risk factors does not mean that he or she cannot be deemed to be at high risk for progression to severe COVID-19. That determination is a purely medical one that must be left to the clinical judgment of the patient's physician, not the court.

The CDC acknowledges this, stating on its website that its list of underlying medical conditions associated with higher risk for severe COVID-19 "does not include all possible conditions that put [a patient] at higher risk of severe illness from COVID-19," and that patients must "talk to [their] healthcare provider" about their risk profile and how best to protect themselves from COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (accessed Mar. 21, 2022). Nor is the presence of comorbidities a *sine qua non* for the risk of developing severe COVID-19. Indeed, a

---

[6] According to the CDC, "severe illness from COVID-19" is defined as "hospitalization, admission to the intensive care unit (ICU), intubation or mechanical ventilation, or death." See https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/underlying-evidence-table.html (accessed Mar. 21, 2022).

substantial percentage of COVID-related deaths occur where the patient has no underlying comorbidities at all.[7]

Further, the NYS and NYC Orders have carved out a race- and ethnicity-based exception to the EUA parameters by ordering medical providers in New York to deem all Hispanic and non-white persons as "high risk" of developing severe COVID-19 simply because of their heritage and skin color, while not doing so for identically situated people who are classified as non-Hispanic white. An order enjoining Defendants from requiring medical providers to consider "non-white race or Hispanic/Latino ethnicity" as a "risk factor" in determining a patient's priority for receiving COVID-19 oral antiviral and monoclonal therapy treatments would eliminate this carve-out and level the playing field, thereby redressing the inequity to Plaintiff Stewart and Plaintiff FAIR's members.

For the foregoing reasons, the *Roberts* decision was incorrectly decided, has no application here and should not be followed.

Respectfully submitted,

Ameer Benno

cc: All counsel by ECF

---

[7] *See* https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#Comorbidities (accessed Mar. 21, 2022) (more than 5% of deaths do not have a co-morbidity listed); https://wirepoints.org/illinois-covid-19-crisis-daily-data-update-wirepoints/ (accessed Mar. 21, 2022) (Up to 25% of COVID-19-related deaths in Cook County, Illinois occurred in patients without any comorbidities).